128 F.3d 1014
 122 Ed. Law Rep. 48
 Heather SMITH, and her parents Sharon Smith and John Smith,
Plaintiffs-Appellees,
v.
METROPOLITAN SCHOOL DISTRICT PERRY TOWNSHIP, Board of
Metropolitan School District Perry Township, Lloyd
Bodie, Principal of Southport High
School, et al., Defendants-Appellants.
 No. 95-3818.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 13, 1996.
Decided Oct. 22, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied Dec. 16, 1997.
 
 Richard J. Swanson (argued), Macey, Macey & Swanson, Timothy L. Stewart, Vernon J. Petri, P.C., Indianapolis, IN, for Plaintiffs-Appellees.
 William H. Kelley, Shannon L. Robinson and Jennifer A. Bauer (argued), Kelley, Belcher & Brown, Bloomington, IN, Louis H. Borgmann, Jackson & Borgmann, Indianapolis, IN, for Defendants-Appellants.
 Before COFFEY, MANION, and ROVNER, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 Steve Rager, a teacher at Southport High School in Indianapolis, Indiana, had an affair with Heather Smith, then a senior at Southport. Heather sued Rager, the Metropolitan School District Perry Township, the Board of Metropolitan School District Perry Township, and the principal and assistant principal of Southport High School for, among other things, violating Title IX's prohibition against sex discrimination. The defendants unsuccessfully moved for summary judgment. We granted defendants permission to file an interlocutory appeal from that denial, and now reverse.
 
 BACKGROUND
 
 2
 The following undisputed facts serve as background to this appeal. Heather Smith (Smith) was born on August 23, 1973. She first met defendant Steve Rager when she was a freshman at Southport High School. Rager taught physical education at Southport and also coached the boys' swim team. Smith was a member of the girls' swim team and often saw Rager at Southport's swim meets. Rager was also a friend of Smith's parents.
 
 
 3
 The summer following her freshman year, Rager coached Smith through a community summer swimming program. Smith's acquaintance with Rager continued during her sophomore and junior years at Southport and through her participation in the summer swimming program. Up to the summer before her senior year, Smith regarded Rager merely as her coach. But by her third year in the summer program, Smith came to regard Rager as "a very good friend" and "someone she could go to and talk."
 
 
 4
 The following school year (1990-91) was 17-year-old Smith's senior year. On the first day of classes Rager asked Smith to become his student assistant during her study hall period. Students at Southport had the option of serving as assistants to teachers during study hall, and approximately ten percent of the student body participated in this program. Student assistants usually typed, filed, or ran errands for the teacher. Smith obtained permission to become Rager's student assistant and Rager cleared it with William Pickard, an assistant principal. Beginning in March of 1991, Smith also worked for Rager outside of school at his scuba shop.
 
 
 5
 In September 1990, shortly after Smith began as Rager's student assistant, Rager made his first sexual advance on Smith: Rager asked Smith if he could give her a kiss, to which she responded with surprised silence. He then said, "You thought I was meaning the real thing," and handed her a Hershey's Kiss. He then said, "You wanted the real thing, didn't you?" and kissed her. Smith kissed Rager back. This occurred in his office in the school building during the class period in which Smith was assigned as Rager's student assistant.
 
 
 6
 Over the ensuing weeks, the kissing continued. Rager also began to put his hand up Smith's skirt. Near the end of September, Rager took Smith into his office bathroom and they had sexual intercourse. On subsequent occasions, they had sex in the bathroom and in a "hospitality room" under the bleachers. Throughout the school year, Rager and Smith had sex about twice a week, always (except for two occasions) on school premises. Rager did not force himself on Smith and she did not resist his advances or tell him "no," except with respect to oral sex, although she later complied with Rager's initiations. Smith enjoyed the sexual relationship and found that she now trusted Rager more than ever. Rager told Smith that he loved her and Smith responded in kind. Smith told no one about the sexual relationship with Rager until it was over and no one ever saw them having sex together. During the school year, Rager and Smith concealed the relationship by engaging in sex quietly in locations where they would not be observed.
 
 
 7
 As time passed, Smith began to feel confused and disturbed. She was afraid to tell Rager "no" and worried that if she told her parents they would be disappointed. She also worried that she might get in trouble if she told school officials. She decided that while she would rather not engage in sex, in order to maintain the relationship and keep Rager happy, she would have to continue to do so. In January 1991, Smith questioned Rager for the first time about discontinuing the sex. On that and later occasions, she asked him whether he would understand and remain her friend if they stopped having sex. Rager said he would. Smith nonetheless continued to have sex with Rager. In fact, their sexual relationship continued after Smith graduated from Southport High School. Finally, on July 12, 1991, Smith told Rager that she wanted to stop. He asked her for "one last time," and she agreed. After that, they engaged in sex once more on July 18, 1991. There are other sordid details that occurred during the relationship, but because they add nothing to the legal analysis at issue in this case, and only serve to further embarrass Smith, we need not elaborate.
 
 
 8
 On July 28, 1991, Smith told a male friend (whom she later dated and then married) about her relationship with Rager. The next day, at her friend's urging, she told her parents about her sexual relationship with Rager. She and her parents then reported it to the sheriff's office and school officials. Two days later, school officials suspended Rager and advised him that if he did not resign he would be fired and lose his teaching license. Rager resigned the following day. The school district then sent a letter to the State Board of Education recommending that Rager's teaching license be revoked.
 
 
 9
 Almost two years later, in May 1993, Smith and her parents filed a multi-count complaint against the Metropolitan School District Perry Township ("School District"), the Board of Metropolitan School District Perry Township ("School Board"), Lloyd Bodie, the principal of Southport High, Larry Hensley-Marshand, the assistant principal of Southport High School, and Rager. (Other defendants were originally named, but later voluntarily dismissed.) In Count I, Smith alleged a claim of sex discrimination under Title IX against the School District, School Board, Bodie and HensleyMarshand. Count II was brought by both Smith and her parents under 42 U.S.C. § 1983 and alleged claims against the School District, School Board, Bodie and Hensley-Marshand and Rager for various alleged constitutional violations. Count III was a state law negligence claim brought against the School District, School Board, Bodie, HensleyMarshand and Rager. Counts IV and V were state law claims against Rager for intentional infliction of emotional distress and seduction.
 
 
 10
 The School District, School Board, Bodie, and Hensley-Marshand moved for summary judgment. (Rager did not join in the motion for summary judgment and is not a party on appeal.) The district court granted their motion on the § 1983 claim alleged in Count II, but denied summary judgment on the Title IX claim alleged in Count I and the negligence claim alleged in Count III. The School District, School Board, Bodie and Hensley-Marshand requested the district court to certify for interlocutory appeal under 28 U.S.C. § 1292(b) the question of liability under Title IX. The district court did so, and we accepted the interlocutory appeal.
 
 ANALYSIS
 
 11
 Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681(a). In Cannon v. University of Chicago, 441 U.S. 677, 717, 99 S.Ct. 1946, 1968, 60 L.Ed.2d 560 (1979), the Supreme Court held that Title IX implicitly provides a private right of action for sex discrimination. Smith brought such a private action here, alleging sexual harassment by Rager and naming as defendants the School District, the School Board, the principal and assistant principal of Southport High School.
 
 I. Appropriate Defendants Under Title IX
 
 12
 Although the district court did not address the issue, this case presents an initial question concerning the appropriate defendant in a Title IX action. Because Smith's lawsuit sought recovery against the principal and assistant principal of Southport High School, in both their official and individual capacities, before we consider the propriety of the district court's ruling on the summary judgment motion, we must determine whether a claim under Title IX can be stated against such defendants.
 
 
 13
 First we consider the language of Title IX: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." By its terms, Title IX prohibits discrimination only by a "program or activity" receiving federal funding. Accordingly, in Lipsett v. University of Puerto Rico, 864 F.2d 881, 884, 901 (1st Cir.1988), the First Circuit concluded that a claim could not be established under Title IX against a supervisory official, either individually or officially, since "[i]n implying a cause of action under Title IX, the Supreme Court has considered only actions against the educational institution itself." Id. (citing Cannon, 441 U.S. 677, 99 S.Ct. 1946). Id. ("[T]he separate liability of the supervisory officials at the University must be established, if at all, under § 1983, rather than under Title IX."). See Lillard v. Shelby County Bd. of Educ., 76 F.3d 716, 730 (6th Cir.1996) (Nelson, J., concurring) ("I do not believe that Title IX can appropriately be read as subjecting anyone other than educational institutions to liability for violation of its terms."). Cf. Rowinsky v. Bryan Indep. Sch. Dist., 80 F.3d 1006, 1012 (5th Cir.1996) (rejecting student-on-student sexual harassment claim because Title IX prohibits only discrimination by the grant recipient).
 
 
 14
 The majority of courts considering this issue also has concluded that only a grant recipient can violate Title IX. Burrow By and Through Burrow v. Postville Comm. Sch. Dist., 929 F.Supp. 1193, 1207 (N.D.Iowa 1996) ("The majority of lower courts explicitly addressing this issue have held that a damage remedy under Title IX is only available against an 'education program or activity receiving Federal financial assistance,' not individuals.") (quoting Lillard, 76 F.3d at 730); Nelson v. Temple University, 920 F.Supp. 633, 638 (E.D.Pa.1996) (holding that a plaintiff cannot maintain a Title IX cause of action against an individual); Clay v. Board of Trustees of Neosho County Community College, 905 F.Supp. 1488, 1495 (D.Kan.1995) ("Title IX actions may only be brought against an educational institution, not an individual acting as an administrator or employee for the institution"); Bowers v. Baylor Univ., 862 F.Supp. 142, 145-46 (W.D.Tex.1994) (dismissing Title IX claim against administrators and employees of educational institutions which were separately incorporated because they "do not constitute educational institutions in and of themselves"); Doe v. Petaluma City Sch. Dist., 830 F.Supp. 1560, 1576 (N.D.Cal.1993), reconsidered in part, 949 F.Supp. 1415 (N.D.Cal.1996) (holding that individuals may not be held personally liable under Title IX "[s]ince the Act prohibits discrimination against beneficiaries in programs and activities that receive federal financial assistance, it is the educational institution that must be sued for violations of Title IX"); Roth v. School Bd. of Collier County, 1996 WL 391703 (M.D.Fla.1996) (unpublished decision) (individuals may not be held personally liable under Title IX).[1]
 
 A. Individual Capacity Liability
 
 15
 Because Title IX only protects against discrimination under any education program or activity receiving federal financial assistance, we agree with the First Circuit's conclusion in Lipsett that a Title IX claim can only be brought against a grant recipient and not an individual. While the Supreme Court has not directly addressed this issue, such a premise underlies many of its decisions; "[t]he Supreme Court has repeatedly stated that the purpose of Title IX is to prevent discrimination by grant recipients." Rowinsky, 80 F.3d at 1013. Moreover, "[t]he fact that Title IX was enacted pursuant to Congress's spending power is evidence that it prohibits discriminatory acts only by grant recipients." Id. at 1012 (emphasis added). As the court in Rowinsky explained:
 
 
 16
 As an exercise of Congress's spending power, Title IX makes funds available to a recipient in return for the recipient's adherence to the conditions of the grant. While it is plausible that the condition imposed could encompass ending discriminatory behavior by third parties, the more probable inference is that the condition prohibits certain behavior by the grant recipients themselves.
 
 
 17
 Id. at 1012-13. "The legislative history of Title IX also supports limiting the statute to the practices of grant recipients ... [since] [t]hroughout the legislative history, both supporters and opponents of the amendment focused exclusively on acts by the grant recipients." Id. at 1013-14. Finally, "[t]his conclusion is reinforced by the statutory provision for administrative enforcement, which refers only to actions federal agencies may take against institutions." Petaluma City, 830 F.Supp. at 1577, reconsidered in part, 949 F.Supp. 1415. For example, § 902 of the Act refers only to actions against institutions: "The ultimate sanction for noncompliance is termination of federal funds or denial of future grants." Petaluma City, 830 F.Supp. at 1560 (quoting North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 514-15, 102 S.Ct. 1912, 1914-15, 72 L.Ed.2d 299 (1982)). "While a private right of action for damages exists under Title IX, Cannon, 441 U.S. at 688-89, 99 S.Ct. at 1953, Franklin, 503 U.S. at 75, 112 S.Ct. at 1037-38, the fact that administrative enforcement is directed at the institution that receives federal funds suggests that the private right of action is similarly confined to actions against the institution." Petaluma City, 830 F.Supp. at 1577, reconsidered in part, 949 F.Supp. 1415. The 1986 Amendment to Title IX further supports the conclusion that no private right of action exists against individuals, because that amendment abrogated Eleventh Amendment immunity in this limited respect and allowed remedies "to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." Petaluma City, 830 F.Supp. at 1577 (quoting 42 U.S.C. § 2000d-7(a)(2) (emphasis added)). Because neither Lloyd Bodie, the principal of Southport High, nor Larry Hensley-Marshand, the assistant principal of Southport, individually, is a grant recipient under Title IX, Smith's Title IX claim against them cannot stand.
 
 B. Official Capacity
 
 18
 Whether the claims against Bodie and HensleyMarshand, officially, also fail is a more difficult question. It requires us to determine whether a principal or an assistant principal constitutes a grant recipient. Title IX prohibits discrimination in a "program or activity." Section 1687 of Title IX defines "program or activity" to "mean all of the operations of--(B) a local educational agency (as defined in § 8801 of this title), system of vocational education, or other school systems," 20 U.S.C. § 1687, and § 8801 in turn defines "a local education agency" as:
 
 
 19
 (A) a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools.
 
 
 20
 (B) The term includes any other public institution or agency having administrative control and direction of a public elementary or secondary school.
 
 
 21
 Because § 8801 directs us to state law to determine the public authority within the school system, we look to Indiana law to determine whether a school district, school board, principal or assistant principal has administrative control over Southport High. Indiana law provides that
 
 
 22
 [i]t shall be the duty of the metropolitan school district to conduct the educational activities of all the schools in said district in harmony with state law and in general conformity with the laws of the state of Indiana with reference to public education. The control and administration of the schools of the metropolitan school district shall be vested in a metropolitan board of education whose composition, duties, manner of election, and powers are herein prescribed.
 
 
 23
 Ind.Code § 20-4-8-13. Indiana law further provides that it is "the duty of the board to act upon the recommendations of the metropolitan superintendent of schools and to make all other such decisions and perform all other such duties as fall within the general framework of the laws of the state." Ind.Code. § 20-4-8-19. Thus, under Indiana law, the school board and school district have administrative control over educational "programs or activities." Cf. Partee v. Metropolitan Sch. Dist. of Wash. Tp., 954 F.2d 454, 456 (7th Cir.1992) ("Indiana law provides that school boards ... have the authority to 'prepare, make, enforce, amend, or repeal rules, regulations, and procedures for the government and management of the ... school corporation, its agents, employees and pupils ....' " (citing Ind.Code § 20-5-2-2(1) (1991)).
 
 
 24
 On the other hand, Indiana law does not provide principals and assistant principals with administrative control over educational "programs or activities." Indiana law defines a principal to mean "an administrator in a public school located in Indiana." Ind.Code § 20-1-1.6-3. It gives a principal the authority to "take any action concerning his school or any school activity within his jurisdiction which is reasonably necessary to carry out or prevent interference with an educational function or school purposes." Ind.Code § 20-8.1-5.1-5. While a principal has some authority over the activities within his school, the above statutes place institutional control over "program or activities" with the school district and school board. Indiana law also does not give assistant principals administrative control over educational programs or activities; absent is any administrative authority or control over the school itself.[2] Thus neither a principal nor an assistant principal can be considered a grant recipient. Accordingly, Smith's Title IX claim against Bodie and Hensley-Marshand, in their official capacities, must also fail.[3]
 
 II. Sexual Harassment
 
 25
 Smith's Title IX claim against the School Board and School District remains. Her claim alleges discrimination on the basis of sex, premised on alleged sexual harassment by Rager. Smith does not allege sexual harassment of the quid pro quo nature; rather her claims are in the nature of a hostile environment claim.
 
 
 26
 In Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 75, 112 S.Ct. 1028, 1037-38, 117 L.Ed.2d 208 (1992), the Supreme Court stated that "Title IX places on [public schools] the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminate[s] on the basis of sex.' We believe the same rule should apply when a teacher sexually harasses and abuses a student." Id. (quoting Meritor, 477 U.S. at 64, 106 S.Ct. at 2404). This language implies that Title IX's prohibition of discrimination "on the basis of sex" includes sexual harassment by a teacher of a student. The Tenth Circuit in Seamons v. Snow inferred as much when citing Franklin for the proposition that "Title IX does protect against sexual harassment hostile educational environment." Seamons v. Snow, 84 F.3d 1226, 1232 n. 7 (10th Cir.1996). In Rowinsky, the court also assumed the same, noting that "sexual harassment by a teacher falls within the framework of Meritor...." 80 F.3d at 1011 n. 11. And later in Canutillo Indep. Sch. Dist. v. Leija, 101 F.3d 393, 396 (5th Cir.1996), the Fifth Circuit noted that "[f]or purposes of this appeal, we assume that discrimination 'on the basis of sex' includes sexual abuse of a student by a teacher." Likewise, implicit in the Fifth Circuit's decision in Rosa H. v. San Elizario Indep. Sch. Dist., 106 F.3d 648, 660 (5th Cir.1997), is that sexual harassment constitutes sex discrimination under Title IX. Similarly, in Murray v. New York University College of Dentistry, 57 F.3d 243, 248-49 (2d Cir.1995), the court assumed that sexual harassment of a student by a teacher constituted discrimination "on the basis of sex."[4] In Kinman v. Omaha Pub. Sch. Dist., 94 F.3d 463, 469 (8th Cir.1996), the Eighth Circuit remanded for trial a student's Title IX claim based on a teacher's hostile environment sexual harassment of a student, and in doing so set forth elements for a prima facie case of hostile environment sexual harassment under Title IX. Other Title IX cases involving employees, rather than students, also have held that discrimination "on the basis of sex" includes discriminatory sexual harassment. See, e.g., Lipsett v. University of Puerto Rico, 864 F.2d 881, 901 (1st Cir.1988) (holding that an educational institution may be liable under Title IX for hostile environment sexual harassment). In Doe v. Claiborne County, 103 F.3d 495, 513 (6th Cir.1996), the Sixth Circuit held "the 'discrimination' prohibition of Title IX encompasses the sexual harassment of a student by a teacher." Based upon these precedents, and our agreement with them, we hold that a teacher's sexual harassment of a student constitutes discrimination "on the basis of sex" for purposes of Title IX.
 
 III. Standard for Institutional Liability
 
 27
 With this conclusion that Rager's treatment of Smith constitutes sex discrimination under Title IX, the next and even more difficult question is: what standard governs institutional liability of a school district for a teacher's sexual harassment of a student? This is an issue of first impression in this circuit.
 
 A. Agency Principles
 
 28
 Smith claims that the School Board and School District, who are the grant recipients, are liable under Title IX because Rager was an employee of the recipients, and his actions are imputed to the grant recipients. Smith then proposes two alternative standards for imputing Rager's actions to the School Board or School District, one based on Title VII's "knew or should have known" standard, and the other based on common law agency principles, specifically § 219 of the Restatement (Second) of Agency:
 
 
 29
 (2) A master is not subject to liability for the torts of his servant acting outside the scope of their employment, unless:
 
 
 30
 (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.
 
 
 31
 As just noted, Smith proposes two alternative standards: one based on Title VII and one based on common law agency principles. While "[c]ourts sometimes conflate these theories," there is a difference--s 219 of the Restatement is a pure agency theory, while Title VII's "knew or should have known" standard is an agency-like theory. Rosa H. v. San Elizario Indep. Sch. Dist., 106 F.3d 648, 653 (5th Cir.1997). In fact, the "knew or should have known" standard is really just a negligence theory. Guess v. Bethlehem Steel Corp., 913 F.2d 463, 464-65 (7th Cir.1990). While courts often conflate these theories, "[i]t is helpful to distinguish pure agency theories from agency-like theories that rely on Title VII's liability scheme," because " 'common-law [agency] principles may not be transferable in all their particulars to Title VII.' " Rosa H., 106 F.3d at 653 (quoting Meritor, 477 U.S. at 72, 106 S.Ct. at 2408). Nevertheless, because Smith's arguments for adopting Title VII's "knew or should have known" standard, and the standard set forth in § 219 of the Restatement, both rely on the premise that agency principles, pure or in part, apply in Title IX cases, we begin by considering whether agency principles (in any form) should govern institutional liability.
 
 
 32
 In proposing that the School Board and School District should be liable for Rager's actions based on agency principles, Smith relies extensively on Title VII case law in arguing that "[b]ecause Title VII prohibits the identical conduct proscribed by Title IX, Title VII is the most appropriate guide to follow in defining Title IX's substantive liability standards." She claims that the Supreme Court adopted this approach in Franklin by stating "sexual harassment by a teacher falls within the framework of Meritor because a teacher is an employee of the grant recipient."
 
 
 33
 Initially, we note that Franklin did not consider, much less hold, whether the "knew or should have known" standard of Title VII or agency principles in general should apply in Title IX cases; the Franklin decision did not address the standard for institutional liability under Title IX. Although the Court drew on its Title VII decision in Meritor to conclude that sexual harassment is intentional discrimination, it made no reference to Meritor's (or any other Title VII case's) discussion on the standard for institutional liability. Nor did it have to, because in Franklin the school defendants knew of the teacher's alleged harassment and instead of acting to stop it, dissuaded the plaintiff from pressing charges. Thus, institutional liability rested on the institution's actions, and the Supreme Court was not faced with creating a standard for institutional liability based on a teacher's actions.
 
 
 34
 Case law since Franklin also has recognized that Franklin left unanswered the question of whether Title VII or agency principles should apply to a Title IX case. See Rosa H., 106 F.3d at 655 ("Franklin did not establish any sweeping parallel between Title IX and Title VII."); Floyd v. Waiters, 831 F.Supp. 867, 876 (M.D.Ga.1993) (noting that Franklin did not hold the school district liable for the teacher's actions; rather the defendant school district in Franklin was aware of the sexual harassment against one of its students and did nothing to stop it). Kadiki v. Virginia Comm. Univ., 892 F.Supp. 746, 749 (E.D.Va.1995) (noting that the Supreme Court in Franklin did not address whether Title IX actions are governed by Title VII standards); Nelson v. Almont Comm. Sch., 931 F.Supp. 1345, 1354 (E.D.Mich.1996) (noting that "because the only issue before the Supreme Court in Franklin was whether compensatory damages were available as a remedy for intentional discrimination under Title IX, the Court did not reach the issue of the standard by which the liability of a school district is to be determined...."). "In fact, at least one commentator has surmised that the Supreme Court's failure to address this issue in the Franklin case will 'lead to great confusion in the lower courts.' " Hastings v. Hancock, 842 F.Supp. 1315, 1318 (D.Kan.1993) (citing Joanne Liebman Matson, Civil Rights--Sex Discrimination in Education-Compensatory Damages Available in a Title IX Sexual Harassment Claim, 15 U.Ark. Little Rock L.J. 271, 296 (1993)). Franklin left open the question of whether Title VII's "knew or should have known" standard or agency principles govern a Title IX action.
 
 
 35
 Smith is correct that Title VII and Title IX both prohibit sex discrimination, which includes discriminatory sexual harassment. That is the significance of Franklin's reference to Meritor. Franklin, 503 U.S. at 75, 112 S.Ct. at 1037 ("Title IX places on [public schools] the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminate[s] on the basis of sex.' " (quoting Meritor, 477 U.S. at 64, 106 S.Ct. at 2404)). Therefore, it is helpful to look to Title VII to determine whether the alleged sexual harassment is severe and pervasive enough to constitute illegal discrimination on the basis of sex for purposes of Title IX. However, "Franklin's single citation to Meritor Savings to support the Court's conclusion that sexual harassment is sex discrimination does not by itself justify the importation of other aspects of Title VII law into the Title IX context." Rosa H., 106 F.3d at 656.
 
 
 36
 Moreover, while Title VII and Title IX both prohibit sexual harassment as a form of sex discrimination, the statutes differ as to who is prohibited from engaging in that conduct. Title IX prohibits recipients of funds for a "program or activity" from discriminating on the basis of sex, while Title VII prohibits employers from discriminating on the basis of sex. Title VII, however, goes even further--it defines employers to include "any agent of such a person." 42 U.S.C. § 2000e(b). "In Title IX, in contrast, Congress defined 'program or activity' to mean, among other things, 'operations of ... a school system.' This definition does not include agents of such an entity." Floyd, 831 F.Supp. at 876.
 
 
 37
 Smith ignores this important distinction. But this void is significant, especially in light of the development of the "knew or should have known" standard and agency principles under Title VII. In Meritor, while the Court had not yet definitively set out the "knew or should have known" standard, it concluded that lower courts should look to agency principles to determine whether an employer is liable for sexual harassment of an employee by another employee. The Supreme Court reasoned in Meritor that Congress wanted courts to look at agency principles because Congress explicitly defined "employer" to include any "agent" of an employer. Meritor, 477 U.S. at 72, 106 S.Ct. at 2408.[5] Based on Meritor's directive to look to agency principles, this court adopted the "knew or should have known" standard for liability under Title VII. Hunter v. Allis-Chalmers Corp., Engine Div., 797 F.2d 1417, 1422 (7th Cir.1986); North v. Madison Area Ass'n for Retarded Citizens-Developmental, 844 F.2d 401, 407 (7th Cir.1988).
 
 
 38
 Similarly, the "knew or should have known" standard has been applied in suits under the ADA and the ADEA because those statutes define employer to include "any agent of such a person." In Equal Employment Opportunity Commission v. AIC Security Investigations, Limited, 55 F.3d 1276, 1281 (7th Cir.1995), we explained that "the actual reason for the 'and any agent' language in the definition of 'employer' was to ensure that courts would impose respondeat superior liability upon employers for the acts of their agent."[6] In Williams v. Banning, 72 F.3d 552, 553 (7th Cir.1995), we stated that in AIC, "we held that the ADA's definition of 'employer' which (like Title VII) includes an employer's agents, is simply a statutory expression of traditional respondeat superior liability...." Or as the Fourth Circuit put it, the definition of employer to include any agent of such a person is an "unremarkable expression of respondeat superior-that discriminatory personnel actions taken by an employer's agent may create liability for the employer." Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 510 (4th Cir.1994). Thus, the reason the Supreme Court in Meritor applied agency principles to Title VII, and the reason other courts have applied agency principles in the context of ADA and ADEA cases, is because the statutes at issue explicitly defined an employer to include agents of the employer, evidencing Congress' intent to hold employers liable vicariously.[7]
 
 
 39
 Title IX lacks any similar statutory basis for applying agency principles. The language of Title IX does not define a program or activity to include employees working for that program or activity. In fact, it does just the opposite--it defines "program or activity" to include only those who have administrative control of the school. A teacher has no such control. See supra, at 1020-21. Thus, no basis exists under the statutory language to hold grant recipients liable based on agency principles. See Rosa H., 106 F.3d at 654 (refusing to apply agency principles to Title IX because Title IX does not define "program or activity" to include agents of such an entity); Floyd, 831 F.Supp. at 876 (accord); Howard, 876 F.Supp. at 973-74 (accord).
 
 
 40
 In response, Smith cites numerous cases which held, stated in dicta, or implied that an educational institution could be liable under Title IX based on agency principles.[8] For instance, in Rowinsky, 80 F.3d at 1011 n. 11, the Fifth Circuit assumed that a recipient of federal education funds could be held liable for sex discrimination when an agent was the perpetrator: "[S]exual harassment by a teacher falls within the framework of Meritor because a teacher is an employee of the grant recipient. Thus, like the normal sexual harassment case, it is an agent of the defendant who is guilty of the harassment." However, as discussed below, the Fifth Circuit properly rejected this dicta in Rosa H., 106 F.3d at 657 n. 5.
 
 
 41
 Smith also relies on Murray, 57 F.3d at 249. In Murray, the Second Circuit relied on language in Franklin to conclude that common-law principles of agency determine whether the harassing conduct of a supervisor or coworker should be imputed to the employer. Specifically, Murray quoted Franklin:
 
 
 42
 Unquestionably, Title IX placed on [such institutions] the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." Meritor Sav[ings] Bank, FSB v. Vinson, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe.
 
 
 43
 Murray, 57 F.3d at 249.
 
 
 44
 Based on Franklin's citation to Meritor, the Second Circuit in Murray concluded that a Title IX suit for sex discrimination based on sexual harassment should use the same standards as those applied in cases under Title VII, including common-law agency principles. Murray, 57 F.3d at 249. Similarly, in Lipsett, 864 F.2d at 900, the First Circuit held "following Meritor, that in a Title IX case, an educational institution is liable upon a finding of hostile environment sexual harassment perpetrated by its supervisors upon employees if an official representing that institution knew, or in the exercise of reasonable care, should have known, of the harassment's occurrence, unless that official can show that he or she took appropriate steps to halt it."[9] Likewise, Kinman, 94 F.3d 463, relied on Franklin, 503 U.S. at 74-75, 112 S.Ct. at 1037-38, and Meritor as authority for holding a school district liable for the alleged sexual harassment by one of its teachers. (Kinman also recognized the divergent views on the appropriate standard for holding a school liable for alleged sexual harassment by a teacher.) See Kinman, 94 F.3d at 468 (listing various approaches taken in imputing liability to a school district).
 
 
 45
 These decisions place inordinate reliance on Meritor while ignoring its rationale.[10] Meritor applied agency principles to Title VII because the statute defined "employer" to include "agents of the employer." See Meritor, 477 U.S. at 72, 106 S.Ct. at 2408 (specifically noting "Congress' decision to define 'employer' to include any 'agent' of an employer, 42 U.S.C. § 2000e(b)" while also cautioning that "common-law [agency] principles may not be transferable in all their particulars to Title VII."). Unlike Title VII, Title IX does not contain any language that includes the educational institution's agents. Yet none of these circuit decisions even noted, much less analyzed, this significant difference between the two statutes. Neither did most of the district court cases addressing the appropriate standard for institutional liability under Title IX.[11] See, e.g., Petaluma City, 949 F.Supp. 1415; Hastings v. Hancock, 842 F.Supp. 1315, 1318 (D.Kan.1993); Moire v. Temple, 613 F.Supp. 1360, 1366-67 (E.D.Pa.1985), aff'd, 800 F.2d 1136 (3d Cir.1986) (unpublished); Pinkney v. Robinson, 913 F.Supp. 25, 31-34 (D.D.C.1996); Bosley v. Kearney R-1 Sch. Dist., 904 F.Supp. 1006, 1020-25 (W.D.Mo.1995); Bolon v. Rolla Pub. Sch., 917 F.Supp. 1423, 1427-29 (E.D.Mo.1996) (holding school district strictly liable for the actions of a teacher who engaged in sex discrimination). Indeed, one district court that recognized the difference between Title IX and Title VII found it irrelevant: "Given the purpose of Title IX and Congress' mandate that it be broadly interpreted, it is essentially inconsequential that Title IX does not expressly adopt agency principles." Kadiki v. Virginia Commonwealth Univ., 892 F.Supp. 746, 754 (E.D.Va.1995). But Kadiki failed to recognize that the Supreme Court in Meritor emphasized that in Title VII the definition of "employers" included "any 'agent' of the employer." Meritor, 477 U.S. at 72, 106 S.Ct. at 2408.[12]
 
 
 46
 Cases holding to the contrary, that agency principles do not apply in the Title IX context-Rosa H., 106 F.3d 648 (5th Cir.1997), Floyd, 831 F.Supp. 867; Howard, 876 F.Supp. at 974--all did more than merely cite Meritor; they looked behind its rationale and recognized the absence of a statutory basis for applying the "knew or should have known" standard in the Title IX context. In Rosa H., 106 F.3d at 654, the Fifth Circuit explained that "[t]he text of Title IX gives us further reason to think that the school district did not assume the responsibility to pay damages whenever a teacher sexually harasses a student and falls within the scope of common-law agency rules. While Title VII makes explicit reference to the agents of employers, 42 U.S.C. § 2000e(b), Title IX does not instruct courts to impose liability based on anything other than the acts of the recipients of federal funds." Similarly, in Floyd v. Waiters, 831 F.Supp. 867, 876 (M.D.Ga.1993), the court reasoned that common-law agency principles do not apply to claims under Title IX because "under Title VII, the term 'employer' encompasses 'any agent of such a person.' " Id. (quoting 42 U.S.C. § 2000e(b)). "In Title IX, in contrast, Congress defined 'program or activity' to mean, among other things, 'operations of ... a school system.' This definition does not include the agents of such an entity." Id. And in Howard, 876 F.Supp. at 974, the court noted that cases which applied agency principles to Title IX based on Title VII case law "are of very limited value, however, as they do not directly address the differences in Title VII and Title IX." See also, Wright v. Mason City Comm. Sch. Dist., 940 F.Supp. 1412, 1420 (N.D.Iowa 1996) (holding that while Title IX encompasses a claim for peer-to-peer sexual harassment, an educational institution will be liable only if it "knew of the harassment and intentionally failed to take the proper remedial measure because of the plaintiff's sex."); Nelson v. Almont Comm. Sch., 931 F.Supp. 1345, 1354-56 (E.D.Mich.1996) (rejecting Title VII's "knew or should have known" standard and instead adopting Title VI's intentional discrimination standard); R.L.R. v. Prague Pub. Sch. Dist. I-103, 838 F.Supp. 1526, 1534 (W.D.Okla.1993) (granting school district summary judgment on plaintiffs' Title IX claim because plaintiffs failed to establish "discriminatory intent" by coming "forward with any facts showing the custom or policy, acquiescence in, conscious disregard of, or failure to investigate or discipline on the part of the School District or any named defendant.").
 
 
 47
 We agree with the Fifth Circuit in Rosa H.[13] and the several district courts in their conclusion that Meritor's application of agency principles, and the agency-like principles designated in the Title VII context, should not be extended to Title IX, which does not include agents of a program or activity within its purview. Rosa H., 106 F.3d at 654 ("We conclude that Title IX does not contemplate a theory of recovery based purely on agency law."). While Title VII's definition of employers to include agents of the employer unequivocally demonstrated Congress' intent to apply agency principles, Title IX conspicuously lacks any language which indicates that Congress intended that agency principles be used to create institutional liability. See, e.g., Rosa H., 106 F.3d at 654. And "[t]his court will not read into Title IX language expressly included in Title VII, but left out of Title IX." Howard, 876 F.Supp. at 974.[14]
 
 
 48
 This conclusion is further supported by Supreme Court precedent. Where Congress failed to provide a statutory basis for the application of agency principles, the Supreme Court has refused to adopt a federal law incorporating common-law agency principles. Monell v. Dept. of Soc. Serv. of City of N.Y., 436 U.S. 658, 691-92, 98 S.Ct. 2018, 2036-37, 56 L.Ed.2d 611 (1978). In Monell, the Supreme Court held that a municipality could not be held liable under § 1983 based on the common-law agency theory of respondeat superior because the statute and legislative history were devoid of any intent to create a federal law of respondeat superior. The Supreme Court reasoned that since § 1983 prohibited a person (which included municipalities) from "causing" a deprivation of constitutional rights, for recovery against a municipality it must have been the municipality that "caused" the deprivation: "[T]he language [of § 1983] plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights. At the same time, that language cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." Id.
 
 
 49
 Title IX's language also provides no basis for creating a standard of liability based on agency principles. Just as the municipality must "cause" the discrimination, and not merely a municipal employee, so too must a "program or activity" "cause" the discrimination, and not merely an employee of the program or activity. See Floyd, 831 F.Supp. at 876 (assuming that the teacher's assaults on the plaintiffs constituted discrimination based upon sex, the school board took no part in this discrimination, so the teacher's actions do not constitute discrimination under a "program or activity").[15] Just as the Supreme Court refused to impute an employee's actions to the municipality in Monell based on agency principles, so too do we refuse to impute a teacher's actions to a School District or School Board.
 
 B. Spending Clause Legislation
 
 50
 Not only does the statutory language for Title VII and Title IX differ as to who is prohibited from discriminating, but the constitutional source of the statutes also differs, and this difference further supports our conclusion that agency principles cannot be applied to a Title IX suit. Congress passed Title VII under the auspices of the Commerce Clause, while Title IX was passed pursuant to Congress' Spending Clause power. Rosa H., 106 F.3d at 654 ("We have consistently viewed Title IX as Spending Clause legislation."); Lieberman v. University of Chicago, 660 F.2d 1185, 1187 (7th Cir.1981) ("Title IX, as an integral part of this legislative scheme, must be deemed an exercise of Congress' Spending Power, ..."). This difference is significant because statutes adopted pursuant to Congress' spending power allow monetary recovery only for intentional discrimination. Guardians Ass'n, 463 U.S. 582, 599, 103 S.Ct. 3221, 3231, 77 L.Ed.2d 866 (1983). As the Supreme Court noted in Franklin, "remedies were limited under such Spending Clause statutes when the alleged violation was unintentional." Franklin, 503 U.S. at 74, 112 S.Ct. at 1037 (citing Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 28-29, 101 S.Ct. 1531, 1545-46, 67 L.Ed.2d 694 (1981)) (emphasis added). This "militates against the imposition of agency principles," because adopting agency principles in a Title IX case would create institutional liability in cases where the institution lacked the requisite intent to discriminate. Rosa H., 106 F.3d at 654.
 
 
 51
 Smith claims that "[i]ntentional sexual harassment by a teacher for which a school is responsible satisfies the proof of intentional misconduct required for violations of statute enacted under Congress' spending power." Initially we note that this argument begs the questions of "when the school is responsible." Nonetheless, Smith seems to be arguing that the intent necessary for liability in Spending Clause cases is satisfied because Rager's conduct was intentional and that intent is imputed to the School Board and School District.
 
 
 52
 While Smith contends that imputing a teacher's intent to the school district limits institutional liability to intentional actions, this argument improperly shifts the focus from the "program or activity," which must have acted intentionally, to the teacher, who in abusing a child clearly acts intentionally, including his intent to keep his unwarranted conduct secret. "We do not agree that a plaintiff can evade Title IX's intent requirement so easily." Rosa H., 106 F.3d at 652. The appropriate question still must be whether the "program or activity" acted with intent, because as held above, only a grant recipient--a recipient of grant funds to run a "program or activity"--can violate Title IX. Thus, it must be the grant recipient--an institution or agency having administrative control over the school--that discriminates against the plaintiff. 20 U.S.C. § 8801. Smith's Title IX suit against the School Board and School District, however, is based on alleged sexual harassment by Rager--a teacher, not a grant recipient--and neither standard Smith proposes for imputing Rager's intent to the School Board or School District requires the program or activity to act intentionally. This is best illustrated by considering separately the standards she suggests.
 
 
 53
 First, Smith argues that Title VII's "knew or should have known" theory imputes a teacher's intent to a school. Under this standard the School District and School Board would be liable to Smith if they either "knew" of the alleged sexual harassment, or "should have known," but failed to respond. While a School District or School Board that "knew" and failed to respond to sex discrimination would act with the intent required to suffer a monetary judgment under the Spending Clause, see infra at 1033-34, the "should have known" prong of Title VII's standard is a standard based on negligence, not intent. Guess v. Bethlehem Steel Corp., 913 F.2d 463, 465 (7th Cir.1990) (the knew or should have known standard "is a negligence standard...."). Negligence cannot support a monetary award for a claim brought under Spending Clause legislation, Guardians, 463 U.S. at 599, 103 S.Ct. at 3231; Franklin, 503 U.S. at 74, 112 S.Ct. at 1037; Pennhurst, 451 U.S. at 28-29, 101 S.Ct. at 1545-46, so a "should have known" standard cannot create institutional liability under Title IX. Rosa H., 106 F.3d at 656-58.[16]
 
 
 54
 The second standard Smith proposes is a pure agency theory based on § 219(2)(d) of the Restatement (Second) of Agency. As excerpted earlier, this section provides that an employer is liable "for the torts of his servants acting outside the scope of their employment, ... [if] the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation."[17] Smith claims that the School Board and School District are liable under § 219 because Rager was able to engage in the sexual relationship with her because of the authority he had over her.
 
 
 55
 Section 219(2)(d) of the Restatement is of no avail for two reasons. First, Smith's allegations do not fall within the narrow factual circumstances covered by the "or he was aided in accomplishing the tort by the existence of the agency relation," clause of § 219(2)(d). As "[t]he commentary to the Restatement suggests ... this exception embraces a narrower concept that holds the employer liable only if the tort was 'accomplished by an instrumentality, or through conduct associated with the agency status.' " Gary v. Long, 59 F.3d 1391, 1397 (D.C.Cir.1995) (quoting Restatement § 219 cmt. e). The commentary illustrates liability under the second clause of § 219(2)(d) with two narrow examples: a telegraph operator sending false telegraph messages, or a store manager cheating customers at the store. As the D.C. Circuit recognized, "[i]n such cases, '[l]iability is based upon the fact that the agent's position facilitates the consummation of the [tort], in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.' " Gary, 59 F.3d at 1397 (quoting Restatement § 261 cmt. a; see also id. § 219 cmt. e (citing § 261 in discussion of § 219(2)(d))). In this case, Rager's conduct could hardly "seem regular on its face," nor could Rager appear to be acting in the ordinary course of the business confided to him in having sexual intercourse with Smith. And Smith does not contend otherwise. Both carefully hid the conduct because of its obvious irregularity, to say the least. Therefore, factually, § 219(2)(d) cannot be used to impute Rager's intent to the School Board and School District.
 
 
 56
 Smith's reliance on § 219(2)(d) is misplaced for another reason--it creates strict liability and strict liability cannot form the basis for a monetary award in a suit brought pursuant to Spending Clause legislation. If we were to adopt Smith's broad reading of § 219(2)(d), we would in effect create strict liability for school districts because "in virtually every case in which a teacher harasses, seduces, or sexually abuses a student," the teacher's status as a teacher often enables the teacher to abuse the student, so liability would arise under § 219(2)(d) because the servant was "aided in accomplishing the tort by the existence of the agency relationship." Rosa H., 106 F.3d at 655. Liability is strict when it is imposed no matter how reasonably the defendant acts. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts, 75 at 534 (5th ed. 1984) (" 'Strict liability,' as that term is used in this chapter, and as that term is commonly used by modern courts, means liability that is imposed on an actor apart from ... a breach of a duty to exercise reasonable care, i.e., actionable negligence. This is often referred to as liability without fault."). In other words, where liability arises without regard to fault and apart from negligence, liability is strict. Konradi v. United States, 919 F.2d 1207, 1210 (7th Cir.1990) ("The liability of an employer for torts committed by its employees--without any fault on his part--when they are acting within the scope of their employment, the liability that the law calls 'respondeat superior,' is a form of strict liability. It neither requires the plaintiff to prove fault on the part of the employer nor allows the employer to exonerate himself by proving his freedom from fault."). See also Guess v. Bethlehem Steel Corp., 913 F.2d 463, 465 (7th Cir.1990) ("The truth is that respondeat superior is, from the employer's standpoint, a doctrine of strict liability. It makes the employer liable, regardless of what he knew or should have known or did or should have done, for the torts that his employees commit in the course of, or (in the case of intentional torts) in the furtherance of, their employment."). To impute liability to a program or activity under § 219 based on a teacher's actions, as Smith seeks to do, would create liability for the School District and School Board even if they acted without notice of the alleged harassment; even if they had no reason to know of the harassment; and even if they acted entirely reasonably. That is strict liability, North v. Madison Area Ass'n for Retarded Citizens, 844 F.2d 401, 407 (7th Cir.1988), and cannot be used to support a monetary award in a Spending Clause case such as this.
 
 
 57
 That was the Fifth Circuit's holding in Canutillo, 101 F.3d at 393. In Canutillo, the Fifth Circuit rejected strict liability, explaining that "[s]imply put, strict liability is not part of the Title IX contract." Id. at 399. In rejecting strict liability as the standard for liability under Title IX the Fifth Circuit explained that:
 
 
 58
 Congress must be unambiguous in expressing to school districts the conditions it has attached to the receipt of federal funds. Nothing in the statute, however, places a school district on notice that it will be strictly liable for its teachers' criminal acts. In fact, the conditions Congress imposed on Title IX recipients are limited to those anti-discrimination factors found in its sparse wording; there is no mention of liability standards, such as intent, actual knowledge, gross negligence, or lack of due diligence, let alone the imposition of liability without fault.
 
 
 59
 Id. at 398-99.
 
 
 60
 We agree with Canutillo that an education institution cannot be held strictly liable under Title IX. 101 F.3d at 400. We do not believe that the imposition of strict liability is appropriate for a discrimination case, especially one brought under Title IX:
 
 
 61
 [T]here is no sound policy reason to hold a school district financially accountable, through strict liability, for the criminal acts of its teachers.... [O]ne reason courts and state legislatures have so allocated risk to product manufacturers is because they are better able to spread liability costs among consumers by raising the price of their products. A school district should not be required to perform a comparable task, even if it could. A school district's "products" are its students; there is no "price" to raise. Instead, public schools are funded typically by a combination of federal and state funds and property taxes levied by the local governing body. We refuse to impose the necessity of a "Title IX assessment" in order to spread the risk of million-dollar verdicts. As horrible a crime as child abuse is, we do not live in a risk-free society; it contorts "public policy" to suggest that communities should be held financially responsible in this manner (strict liability) for such criminal acts of teachers.
 
 
 62
 101 F.3d at 399.
 
 
 63
 As the Fifth Circuit noted, "another reason behind product manufacturer strict liability is that the manufacturer is in a better position than a consumer to search for and discover defects in design or manufacture." Canutillo, 101 F.3d at 399 (5th Cir.1996). But school districts have nothing to design, test, or inspect. "[I]ts 'products' are its students; they are not the offending item." Additionally,
 
 
 64
 teacher-student sexual abuse is conducted in secret making it difficult, if not impossible to detect without being told about it. Obviously, immediate and adequate notice is one of the best means of stopping abuse and removing (and convicting) the abuser. In fact, as a matter of public policy, it may well be that requiring knowledge by the school district, often acquired by being told about such abuse, as a condition to recovery of damages will result in much quicker and greater protection not only to the person being abused and providing notice, or on whose behalf it is given, but will also better protect or otherwise benefit those who may then be undergoing abuse from that, or another, teacher.
 
 
 65
 Canutillo, 101 F.3d at 399.
 
 
 66
 Moreover, as we noted in Konradi, 919 F.2d at 1210, in deciding whether to impose strict liability generally, we consider whether it will give employers an incentive to alter the nature or level of their activity, rather than altering their care. Id. As in Konradi it should be apparent here that a school should not be held strictly liable for a tort committed by its employees because no plausible alteration of the activity creating the liability (educating students) is possible. In the final analysis, "[s]trict liability converts the school district from being the educator of children into their insurer as well. And, if it is their insurer, it is most arguable that its role as educator--needed now more than ever--will suffer, and suffer most greatly." Canutillo, 101 F.3d at 400.
 
 
 67
 Not only does the policy underlying the imposition of strict liability weigh against applying strict liability in a Title IX suit, the policy concerns involved in Spending Clause legislation compel the conclusion that agency principles have no place in Title IX litigation because "there is nothing to give notice to the recipient of federal funds that the funds carry the strings of such liability." Rosa H., 106 F.3d at 656.
 
 
 68
 While Guardians involved Title VI rather than Title IX, the rationale provided in Guardians for denying monetary damages for violations of Spending Clause legislation is equally applicable here and is worth stating at length:
 
 
 69
 This is because the receipt of federal funds under typical Spending Clause legislation is a consensual matter: the State or other grantee weighs the benefits and burdens before accepting the funds and agreeing to comply with the conditions attached to their receipt. Typically, before funds are advanced, the appropriate federal official will determine whether the grantee's plan, proposal, or program will satisfy the condition of the grant or other extension of federal funds, and the grantee will have in mind what its obligations will be. When in a later private suit brought by those for whose benefit the federal money was intended to be used is determined, contrary to the State's position, that the conditions attached to the funds are not being complied with, it may be that the recipient would rather terminate its receipts of federal money than assume the unanticipated burdens.
 
 
 70
 Thus, the Court has more than once announced that in fashioning remedies for violations of Spending Clause statutes by recipients of federal funds, the courts must recognize that the recipient has "alternative choices of assuming the additional costs" of complying with what a court has announced is necessary to conform to federal law or not using federal funds and withdrawing from the federal program entirely. Although a court may identify the violation and enjoin its continuance or order recipients of federal funds, prospectively to perform their duties incident to the receipt of federal money, the recipient has the option of withdrawing and hence terminating the prospective force of the injunction.
 
 
 71
 Guardians, 463 U.S. at 596, 103 S.Ct. at 3229.
 
 
 72
 As this excerpt demonstrates, courts "must respect the privilege of the recipient of federal funds to withdraw and terminate its receipt of federal money rather than assume the further obligations and duties that a court has declared are necessary for compliance." Id. at 597, 103 S.Ct. at 3230. The Supreme Court in Franklin relied on this rationale in concluding that monetary damages are not available for unintentional violations of Title IX stating that: "the receiving entity of federal funds lacks notice that it will be liable for a monetary award. This notice problem does not arise in a case ... in which intentional discrimination is alleged." Franklin, 503 U.S. at 74-75, 112 S.Ct. at 1037.
 
 
 73
 The policy against awarding monetary damages for unintentional violations of Spending Clause legislation which was summarized in Guardians and relied on in Franklin also "militate[s] against the imposition of agency principles" under Title IX. Rosa H., 106 F.3d at 654. As the Fifth Circuit aptly explained in Rosa H.:
 
 
 74
 As a statute enacted under the Spending Clause, Title IX should not generate liability unless the recipient of federal funds agreed to assume the liability. In this case, forcing the school district to pay for the unauthorized acts of [a teacher] would be using a federal spending statute to create a private cause of action without regard to whether the recipient of the federal funds knew anything about the violation. When the school board accepted federal funds, it agreed not to discriminate on the basis of sex. We think it unlikely that it further agreed to suffer liability whenever its employees discriminate on the basis of sex. Adopting the customary tort paradigm utilized by the district court would compromise Franklin's principle that "legislation enacted pursuant to the spending power is much in the nature of a contract."
 
 
 75
 Rosa H., 106 F.3d at 654 (quoting Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539-40, 67 L.Ed.2d 694 (1981)).
 
 
 76
 "Congress did not enact Title IX in order to burden federally funded educational institutions with openended negligence liability." Rosa H., 106 F.3d at 656. If a negligence standard such as Title VII's "knew or should have known" standard is applied under Title IX, after the fact, by a jury, a school can never know the conditions attached to the funds; the jury's announcement of what is necessary to conform under Title IX will come too late for the grantee to weigh "the benefits and burdens before accepting the funds...." Guardians, 463 U.S. at 596, 103 S.Ct. at 3229. Agency principles that result in strict liability, such as the principles set forth in § 219(2)(d) of the Restatement, are even less justified because the grant recipient can neither know, nor reasonably protect itself from liability. Agency principles will thus deprive schools of the choice of withdrawing from the federal program entirely to avoid the additional cost of compliance--something required by the consensual nature of Spending Clause legislation. Id. Given that we are dealing with children and claims of sexual harassment, which could encompass sexual abuse and molestation, the "additional costs of complying" could prove enormous, although that cost will be unknown until it is too late to turn down the funds. This could financially cripple public education.
 
 
 77
 Smith responds again by citing Franklin. She contends that because the Court in Franklin held that the school district could be held liable for the teacher's sexual abuse, and in doing so noted that liability only arises where the conduct is intentional, the Court must have believed that a teacher's intent could be imputed to the school. However, in Franklin the defendants knew of the alleged harassment but took no action to halt it, and in fact dissuaded the plaintiff from pressing charges. The school itself acted intentionally; the intent of the teacher was not imputed to the school. In short, "[w]e can find nothing in Franklin to support the trial court's theory that Title IX can make school districts liable for monetary damages when the district itself engages in no intentional discrimination." Rosa H., 106 F.3d at 656. See also id., 106 F.3d at 654 ("We are not convinced that Franklin instructs us to find school districts vicariously liable whenever an employee intentionally harasses a student because of sex and satisfies the agency rules....").[18]
 
 
 78
 Although the parties did not raise it, in deciding that agency principles should apply to Title IX cases, other courts have relied on the Department of Education's Office of Civil Rights' view. In its "Final Policy Guidance," issued on March 13, 1997, the OCR registered its disagreement with the Fifth Circuit's interpretation of Title IX in Rosa H. and Rowinsky, and stated that its long-recognized policy has been that sexual harassment (including same-sex sexual harassment) of students by school employees, other students, or third parties is covered by Title IX and that agency standards govern institutional liability. In the view of the OCR, a school is always liable for quid pro quo harassment of a student even if the school did not approve, know of, or could not have reasonably known of the harassment. For hostile environment harassment by school employees, other students, or third parties, the OCR advises that the school is liable under Title IX for negligence. In the case of school employees the school is also automatically liable if the employee acted with what the OCR terms "apparent authority," or was aided in carrying out the sexual harassment of the student by his position. Under the Guidelines' discussion of apparent authority, even employees such as janitors or cafeteria workers may have apparent authority to sexually harass a student if the student believed the employee had authority over them. Whether the student's subjective view of "apparent" authority was reasonable depends, among other things, upon the age of the student. "[I]n some cases the younger a student is, the more likely it is that he or she will consider any adult employee to be in a position of authority." 62 Fed.Reg. 12034, 12039. Under this construct, a very young child's subjective belief may create strict liability for school districts under Title IX for an employee's criminal sexual molestation of that child. Id. See also Rosa H., 106 F.3d at 658 n. 6.
 
 
 79
 While this recently elaborated Policy Guidance may represent the longstanding view of the OCR, the application of agency principles has no foundation in the language of Title IX. Yet this Policy Guidance includes a comprehensive discussion of numerous examples of situations where school systems would be exposed to liability under various agency theories. In concluding that agency principles apply in the Title IX context, the Policy Guidance fails to examine the statutory language of Title IX, its Spending Clause source, and the significant differences between it and Title VII. Concisely put: the Guidance provides no rationale for applying agency principles and thus no basis for the greatly expanded exposure to liability for educational institutions. The Department of Education also completely failed to consider the financial impact its policy--including the adoption of strict liability--would have on school districts that accept federal funds under Title IX. Moreover, the Policy Guidance is neither a regulation, nor an interpretation of regulations promulgated by the OCR or DOE. See Policy Guidance, 62 Fed.Reg. 12034 ("the Guidance provides educational institutions with information regarding the standards that are used by the Office of Civil Rights."). And while the OCR sought public comment before issuing the Policy Guidance, it "did not request substantive comments" on its policy views. Policy Guidance, 62 Fed.Reg. 12035. Under these circumstances we cannot defer to the OCR's Policy Guidance. See Rowinsky, 80 F.3d at 1016 ("Absent a reasoned explanation for why the statutory language supports applying Title VI to peer harassment, the OCR's interpretation should not be accorded any deference."); Doe v. Reivitz, 830 F.2d 1441, 1446-47 (7th Cir.1987) ("The preliminary power of interpretation is in the agency, but the final power of interpretation is in the courts ... [T]he weight given to an agency interpretation depends on many factors, including the validity of its reasoning...."); Pennington v. Didrickson, 22 F.3d 1376, 1383 (7th Cir.1994) (recognizing the "obligation to defer to the interpretation of the agency whenever that interpretation can be said to embody a deliberate and considered interpretation of legislative intent.")
 
 
 80
 The question remains: What is the appropriate standard for institutional liability under Title IX? The Fifth Circuit in Rosa H. concluded that the appropriate standard was an actual knowledge standard: "We hold that a school district can be liable for teacher-student sexual harassment under Title IX only if a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the employee and the power to take action that would end such abuse and failed to do so." 106 F.3d at 660. In so holding, the Fifth Circuit relied on Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), which although based on a "very different area of substantive law," is helpful because it "highlight[s] the distinction between an intentional wrong and a wrong that flows from mere neglect." Rosa H., 106 F.3d at 658-59.
 
 
 81
 We find Rosa H. persuasive and today join the Fifth Circuit in holding that under Title IX, a school district is liable for teacher-student sexual harassment "only if a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the employee and the power to take action that would end such abuse and failed to do so." Id. at 660. In this case, there is no evidence that the defendants knew of the sexual harassment and failed to respond. For whatever reason Smith (and of course Rager) made every effort to hide their ongoing relationship that lasted the entire school year and beyond. Apparently they were successful. Once Smith reported Rager's behavior, the undisputed facts demonstrate that the school took swift and decisive action: Rager was immediately suspended and told to resign and he was reported to the state board of education. While Smith claims there is a factual question in this case as to whether the defendants should have known of the sexual relationship between her and Rager, she does not contend that they actually knew of the relationship and failed to respond, as had been the case in Franklin. Nor do the facts support any such inference. Where a grant recipient has no knowledge of alleged discrimination, it cannot be said to have intentionally discriminated against the plaintiff.
 
 CONCLUSION
 
 82
 Title IX prohibits discrimination on the basis of sex by a "program or activity." Thus, the appropriate defendant is the "program or activity" itself--in other words, the grant recipient. Because Title IX only prohibits discrimination by the "program or activity," it must be the "program or activity" and the institution that operates it that discriminate, not merely one of its employees. Agency principles, either pure or the agency-like principles of Title VII, cannot impute discriminatory conduct of an employee to the "program or activity" because Title IX contains no language indicating that Congress intended agency principles to apply. Rather, "a school district can be liable for teacher-student sexual harassment under Title IX only if a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the employee and the power to take action that would end such abuse and failed to do so." Rosa H., 106 F.3d at 660. Here there is no evidence that anyone had actual knowledge of the alleged relationship between Smith and Rager. On the contrary, it appears that Rager and Smith successfully hid their conduct. Therefore, the School Board and School District were entitled to summary judgment. Moreover, the principal and assistant principal do not constitute the educational "program or activity," either individually or officially, so they too are entitled to summary judgment. Accordingly, we reverse the district court's denial of summary judgment and remand to the district court with instructions to enter summary judgment in favor of defendants on Smith's Title IX claim. We express no opinion on the merits of plaintiffs' other claims.
 
 
 83
 REVERSED and REMANDED.
 
 
 84
 COFFEY, Circuit Judge, concurring.
 
 
 85
 I concur in Judge Manion's analysis of the law. I agree that absent a textual basis in Title IX for the application of "agency principles," the proper legal standard for institutional liability under Title IX is the "actual knowledge" standard set forth in Rosa H. v. San Elizario Independent School Dist., 106 F.3d 648 (5th Cir.1997). I write separately to respond to some of the issues raised in the dissent.
 
 
 86
 As an initial matter, it is clear that the dissenting opinion premises its argument on factual, as opposed to legal, grounds in framing the issue in this case as whether the school district "should have known" of Rager's harassment of the plaintiff, Heather Smith.[1] The dissenter devotes a great deal of effort in an attempt to convince the reader that the evidence contained in the pleadings is sufficient to establish that the school district "should have known" of Rager's harassment. Such effort, while commendable, is nevertheless unavailing, for we today hold the "knew or should have known" inquiry to be improper under Title IX's "agency-free" rubric.
 
 
 87
 As the majority opinion points out, Rager did not force himself on Smith,[2] and she neither resisted his sexual advances nor told him "No" whenever he attempted to become intimate with her. Both Smith and Rager also "concealed the relationship by engaging in sex quietly in locations where they could not be observed." Further, Smith told no one about the relationship until late July 1991, after she had graduated. Upon receiving notice of the harassment, the school responded and promptly suspended Rager, advising him that if he did not resign forthwith he would be terminated and lose his teaching license (immediately after Rager's resignation, the school board recommended to the state board of education that his teaching license be revoked).
 
 
 88
 The dissent goes on to note a number of facts that fall short of establishing that the school authorities "actually knew" of the harassment. For example, it states that Rager was a "constant presence at school swim meets in which Heather participated" in an attempt to make his presence at swim meets sound sinister, even though Rager had been Smith's swim coach for the previous three summers, assisted at the girls' swim meets (score keeping, etc.) and served as the coach of the boys' swim team at the same high school. I have a hard time comprehending how it could be considered unusual for a boys' swim team coach to attend a girls' swim meet competition, or for the girls' swim team coach to attend a boys' swim meet competition. Indeed, one can only assume that school officials welcomed Rager's active role in attending, supervising and assisting in student activities, and probably even encouraged it. The dissent also makes a point of the fact that "[i]n the presence of Heather's [other] coaches and teammates, Rager would rub down Heather's shoulders." It neglects to state that this "shoulder rubbing" occurred in the presence of Smith's parents, and her parents never found it unusual enough to warrant a question, much less a comment or an objection.
 
 
 89
 My dissenting colleague further claims that "[w]e do not learn from the majority opinion ... that Rager and Smith were consistently seen together on school grounds" and that "[t]he District Court referenced [this] ... fact[ ], among others, in finding that a factual question was raised on summary judgment as to what Southport officials knew or reasonably should have known." Rovner Op. at 1045. At the outset, I fail to understand how this evidence was supposed to put the school on notice that Rager was sexually harassing Smith. Since when is it so out of the ordinary for students and their instructors to be seen together regularly on school grounds; after all, is not that where pupils and teachers are required to be during school hours? While the portion of the record to which the dissent cites does not even mention the fact that Smith and Rager were "consistently seen together," I can only assume that the dissent was referring to the deposition testimony of the plaintiff-appellant Smith, who stated that Charles Robbins, the Athletic Director at Southport, saw her and Rager together "probably every other day, when [Rager] would walk [her] to class to the carpeted area of the school ... after [her] assistant period with him." Once again, I do not believe that it is so unusual for a male teacher to be seen in the company of a female student almost daily immediately following the close of the school period during which she was assigned to perform tasks (i.e., filing, typing, answering phones, etc.) as his assistant. Moreover, Smith admits that there were no other students around to see the two of them together, they never held hands, and did not kiss each other good-bye. I also wish to note that, even if Robbins did in fact regularly pass Rager and Smith as they walked together through the halls of Southport, not only did such innocent conduct fail to provide the school administration with notice of their sexual relationship, but it would be presumptuous of us to assume that Robbins truly "saw" the couple. In other words, "seeing" an object involves much more than having it in one's line of vision; rather, it is a mental process whereby one must focus both one's eye and mind on the object. We are confronted with millions of visual images every day, yet it certainly cannot be said that we "see" and take notice of them all, much less common ones (like a student and teacher walking together in a school). For all we know (or Smith knew when she was deposed), Robbins' mind could very well have been elsewhere at those times he crossed paths with Rager and Smith.
 
 
 90
 The dissent mentions that "some members of the swim team wondered, and discussed amongst themselves, why Rager and Smith spent so much time together." Why should gossip of this type or mere speculation among teenaged students on the swim team have any bearing on the knowledge of school officials concerning the relationship? Is there one iota of evidence in the record to suggest that this gossip was ever related to the school authorities? The answer is "no." The dissenter's minute and added detail of the facts goes beyond the requirement of Rule 56 and, thus, does little to contribute to the establishment of the law in this most troubled area of sexual harassment.
 
 
 91
 Turning to the dissenting judge's analysis of the law, I make the following observations:
 
 
 92
 The dissent states that the court's opinion today "buck[s] the clear weight of circuit authority" by failing to adopt "agency principles" (i.e., the "knew or should have known" standard) as the standard for determining institutional liability under Title IX. The dissent would follow the lead of some other circuits and analogize Title IX (education) to Title VII (employment). However, this line of reasoning is not only deeply flawed, but, as the majority opinion makes clear, it is also unpersuasive, for it fails to account for the absence of statutory language in Title IX comparable to Title VII's explicit use of the term "agents."
 
 
 93
 I acknowledge that there may be room for argument over the meaning and scope of "agency principles," but it is beyond dispute that "agency principles" apply in Title VII cases, because, as the Supreme Court explained in Meritor, the text of Title VII specifically defines "employer" to include "agents of the employer." Meritor Savings Bank v. Vinson, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986); 42 U.S.C. § 2000e(b). The case before us, however, involves institutional liability under Title IX, which has no similar statutory language. Because the text of Title VII makes specific reference to the term "agents"--the same word upon which Meritor's holding turned--while the language of Title IX is absent any reference whatsoever to the term "agents," it is obvious that Title VII is not "the most appropriate analogue when defining Title IX's substantive standards," as some courts have concluded absent a well-reasoned analysis. Mabry v. State Bd. of Community Colleges and Occupational Educ., 813 F.2d 311, 316 n. 6 (10th Cir.1987). Attempting to erect a body of Title IX "agency law" on the foundations of Title VII and/or Meritor would thus be logically and legally erroneous. Perhaps for this very reason, the precedents upon which the dissent relies do not even discuss, much less analyze, the key fact that the text of Title IX (unlike the text of Title VII) contains no basis for the application of "agency principles."My esteemed dissenting colleague notes that Meritor "viewed 'agent' as a limiting term," thereby suggesting that our reliance on Title IX's omission of that word is somewhat paradoxical, for "if any meaning is to be read into the absence of the word 'agent' from Title IX, it would be to extend Title IX liability further than Title VII to hold institutions strictly liable for discriminatory conduct without regard to agency principles." Rovner Op. at 1047 (quoting Verna L. Williams & Deborah L. Brake, When a Kiss Isn't Just a Kiss: Title IX and Student-to-Student Harassment, 30 Creighton L.Rev. 423, 450 (1997)). In other words, she reasons that Title IX's standard of liability must logically be broader than that of Title VII because, as set forth in the passage below, the Meritor Court explicitly declined to adopt a strict liability standard in cases of supervisory sexual harassment due to the existence of Title VII's "agency" language; thus, once one removes the term "agent," as did Congress in drafting Title IX, strict liability naturally follows:
 
 
 94
 .... Congress' decision to define "employer" to include any "agent" of an employer surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible. For this reason, we hold that the Court of Appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors. For the same reason, absence of notice to an employer does not necessarily insulate that employer from liability.
 
 
 95
 Meritor, 477 U.S. at 72, 106 S.Ct. at 2408 (emphasis added). I submit that a careful reading of this excerpt from Meritor provides two most compelling justifications as to why the dissent's reasoning is inherently flawed. First, the Court found the term "agent" to "place some limit on the acts of employees for which employers under Title VII" could be held responsible. Id. (emphasis added). This is but another way of stating the obvious; that is, when applying agency principles in the context of Title VII, an employer may only be held liable for the sexually harassing conduct of an employee who acts within the scope of his or her employment. It does not deal with the question of what kind of notice is required of an employer before it may be subject to liability under Title VII. In fact, Meritor separately, albeit briefly, addressed the issue of notice, which brings me to my second point. Namely, the Meritor Court made clear that, because of Title VII's "agency" language, the absence of notice to an employer does not necessarily insulate such employer from liability. Using the dissenting opinion's logic (as well as that of the law review article cited therein), it follows that the absence of the term "agents" from Title IX's language would shield an educational institution having no notice of sexual harassment from liability. How then, as the dissent suggests, could the standard for imposing Title IX liability be broader (i.e., strict liability) than that under Title VII, when Meritor does not even require notice to be had for Title VII liability to lie?
 
 
 96
 In short, I agree with the majority opinion that the decisions relied upon by the dissent "place inordinate reliance on Meritor [and "agency principles"] while ignoring [Meritor's] rationale," which is rooted in the text of Title VII. Maj. Op. at p. 1025. In contrast with those authorities the dissent cites, the majority opinion carefully delineates the textual differences between Title VII and Title IX (i.e., the inclusion of the term "agents" in the former statute and its omission in the latter). In view of these differences, I believe it is proper that we reject the flawed logic of those circuits who have reached out and, based on a foundation of quicksand, treated these two entirely separate and distinct statutes as "analogous." For the same reason, I likewise disagree with the dissent and think it is obvious that we are not "eschew[ing] the more widely-accepted negligence or 'knew or should have known' standard traditionally applied in hostile environment sexual harassment cases under Title VII." Rovner Op. at 1045. After all, let us not lose sight of the fact that this is not a "sexual harassment case[ ] under Title VII."
 
 
 97
 I am also unpersuaded by the dissent's reliance on Title IX's prohibition of sexual harassment "under any education program or activity," which includes "all of the operations of ... a local education agency ..., system or vocational, or other school system." Rovner Op. at 1047 (quoting 20 U.S.C. § 1687 (emphasis added)). The dissenting opinion reasons that, insofar as Title IX forbids harassment "under," as opposed to "by," an educational program or activity, the statute does not reference an actor, and as such, "it necessarily follows that the statute also would not reference 'agents.' " Rovner Op. at 1047 (citing Davis v. Monroe County Bd. of Educ., 120 F.3d 1390, 1406-07 (11th Cir.1997) (Black, J., concurring)). In my view, one should not be so hasty to add meaning to a statute (and, in fact, suggest invoking an entirely different legal framework, i.e., agency law) simply because its drafters chose to express a prohibitory rule in the passive voice, as was done in the case of Title IX. True, the language[3] and objectives of Title VII and Title IX are somewhat alike to the extent that the two statutes both seek to eliminate organizational harassment, whether sexual or racial, from the top down. However, we need be ever-mindful of the Supreme Court's admonition that "although two statutes may be similar in language and objective, we must not fail to give effect to the differences between them." North Haven Board of Education v. Bell, 456 U.S. 512, 530, 102 S.Ct. 1912, 1922, 72 L.Ed.2d 299 (1982) (emphasis added) (contrasting Title IX with Title VI). As between Title VII and Title IX, such similarities give way to one very significant textual difference--a difference that the majority has today seen fit to acknowledge.
 
 
 98
 The dissent criticizes the majority for failing to give proper deference to the Department of Education's interpretation of institutional liability standards under Title IX, as set forth by that agency's Office of Civil Rights ("OCR"). Initially, I do not dispute that "legislative rules" which the OCR promulgates pursuant to its administrative authority under Title IX are entitled to deference from this Court, at least "more than mere deference or weight." Batterton v. Francis, 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977). However, "[a]gency interpretations, unlike legislative rules, are not controlling on the courts," Doe v. Reivitz, 830 F.2d 1441, 1447 (7th Cir.1987) (emphasis added), and as such, they are deserving of little or no deference.
 
 
 99
 The courts may find [agency interpretations] persuasive and may treat them as if they were binding, but the courts have the reserve of power to substitute their own judgment on all questions of statutory interpretation. The preliminary power of interpretation is in the agency, but the final power of interpretation is in the courts.
 
 
 100
 Id. (quoting 2 K. Davis, Administrative Law Treatise § 7:11, at 55 (1979)). The OCR "final policy guideline" in this case appears to be neither an "administrative rule" nor an agency "interpretation." In Rowinsky v. Bryan Independent School Dist., the Fifth Circuit implied as much when it explained that "legislative regulation[s] ... are accorded far greater deference than are interpretive regulations.... The [OCR] Policy Memorandum deserves more deference [than interpretive regulations] because it represents a deliberate policy statement by the agency...." Rowinsky v. Bryan Independent School Dist., 80 F.3d 1006, 1015 (5th Cir.1996) (emphasis added). Clearly, the above-quoted language places administrative rules on a much more deferential platform than policy guidelines, for administrative rules are granted "far greater deference" than agency interpretations while policy guidelines receive only "more deference" than those same agency interpretations. Unfortunately, the Supreme Court has heretofore not been called upon to determine how much "more deference" than no deference we should apply when construing OCR policy guidelines. Thus, courts have seen fit to arbitrarily pick and choose the level of deference they wish to implement in cases such as this one. See Rosa H., 106 F.3d at 658; Cohen v. Brown University, 101 F.3d 155, 173 (1st Cir.1996) ("substantial deference"); Favia v. Indiana University of Pennsylvania, 812 F.Supp. 578, 584 (W.D.Pa.1993) ("great deference"); Bosley v. Kearney R-1 Sch. Dist., 904 F.Supp. 1006 (W.D.Mo.1995) ("some deference").
 
 
 101
 In light of the question as to the amount of deference we are to give to the OCR policy guidelines, I think it is only appropriate that we approach them cautiously. Indeed, while our case law "demonstrate[s] loyal adherence" to the principle that we defer to agency interpretations which evidence an attempt to "implement the will of Congress" through the regulatory process, "we have never interpreted this principle as a direction to approach our review of all government positions with a rubber stamp." Pennington v. Didrickson, 22 F.3d 1376, 1383 (7th Cir.1994) (emphasis added). As noted in the majority opinion, and clearly expressed in our case law, " 'the weight given to an agency interpretation depends on many factors, including the validity of its reasoning.' " Maj. Op. at 1034 (quoting Reivitz, 830 F.2d at 1446-47) (emphasis added); see also Pennington, 22 F.3d at 1383 (Agency interpretations should only be deferred to "whenever that interpretation of the agency can be said to embody a deliberate and considered interpretation of legislative intent.") (emphasis added). The March 1997 Office of Civil Rights' policy guidance, despite its length, fails to explain much less analyze the OCR's position that the "knew or should have known" standard applies in Title IX cases. Instead, it states (in a mere footnote, no less) that agency principles "should govern the liability of educational institutions under Title IX for the harassment of students by teachers." 62 Fed.Reg. 12034 (Mar. 13, 1997) (emphasis added). The OCR, for reasons unexplained, fails to state why such principles "should govern," in light of either the text of Title IX or the two Supreme Court decisions it cites (Meritor and Franklin). Because of the failure of the OCR to provide a "reasoned explanation" for its position, I agree with the holding of the majority opinion that we need not follow the Office of Civil Rights' view on the issue of institutional liability for student-teacher sexual harassment under Title IX, much less treat the OCR policy guidance as holy writ. See Rowinsky, 80 F.3d at 1016 ("Absent a reasoned explanation for why the statutory language supports [the OCR's position], the OCR's interpretation should not be accorded any deference."). We must approach this new and developing area of federal law with acute scrutiny. If the OCR in fact has a reasoned justification for injecting the "knew or should have known" standard into Title IX jurisprudence, it is nowhere to be found, and it would be imprudent for us to attempt to create one. Thus starting with a clean slate, we are of the opinion that the OCR's blind application of Title VII's "agency" principles, without explanation or support in case law, to Title IX's "agency-free" rubric is unwarranted.
 
 
 102
 Just as this court must be extremely cautious before giving statutory language retroactive effect, we must likewise refrain from giving retroactive effect to agency policy guidelines. As late as June of this year (1997), less than four months ago, the Supreme Court emphasized the "presumption against retroactivity" and the "traditional rule requiring retroactive application to be supported by a clear [statutory] statement" in Lindh v. Murphy, --- U.S. ----, ----, 117 S.Ct. 2059, 2062, 138 L.Ed.2d 481 (1997) (emphasis added) (specifically holding that recent amendments to the federal habeas corpus statute did not apply to petitions in non-capital habeas cases pending at the time of the passage of the new legislation). In light of such clear language from our Nation's highest court, I am at a loss to understand how the dissent advocates that we retroactively apply policy guidance finalized in March of 1997, some six years after the events in this case transpired (1990-91). As the Fifth Circuit pointed out in Rosa H.:
 
 
 103
 [W]e cannot apply these guidelines retroactively.... [R]ecipients of Title IX funds are bound by their agreement with the federal government. The government can add strings to the Title IX funds as it disburses them. But it cannot modify past agreements with recipients by unilaterally issuing guidelines through the Department of Education.
 
 
 104
 106 F.3d at 658. Thus, at a minimum, I cannot conceive how one can reasonably argue that the OCR's recently-finalized policy guidance is controlling in this case, the facts of which pre-date the issuance of the guidance by more than five years. Nor has the dissent cited any case law to support its position that we may give this agency guidance retroactive application. Rather, it merely states that "[t]he OCR's 'final policy guidance' does not amend Title IX in the same way that the AEDPA [Anti-Terrorism and Effective Death Penalty Act] amended the federal habeas corpus statute that was at issue in Lindh," and therefore, "there is no retroactivity issue in this case." Rovner Op. at 1049, n. 8. I am at a loss to understand how the OCR's endorsement of the "knew or should have known" standard, and the dissent's automatic adoption of it, would not invoke Lindh's presumption against retroactivity. After all, our recognition of such a standard would most certainly have "substantive effects" and "affect substantive entitlement to relief" in Title IX litigation--two factors which Lindh explains argue against the retroactive application of federal laws. Lindh, --- U.S. at ----, 117 S.Ct. at 2063.
 
 
 105
 In an attempt to buttress its argument, the dissent cites a brief passage from the legislative history of Title IX, which it believes is somehow an "expression of legislative intent" that the "knew or should have known" standard ought to govern the liability of educational institutions for teacher-student harassment. Of course, as the majority opinion makes plain, the clearest indicator of congressional intent is the plain language of the statute itself, and Title IX does not even refer to "agents" in the definition of "program or activity" (in contrast with Title VII's definition of "employer," which does include such terminology).[4] It is well-established that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Baker v. Runyon, 114 F.3d 668, 670 (7th Cir.1997) (emphasis added) (quoting Connecticut National Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149-50, 117 L.Ed.2d 391 (1992)); see also Morse v. Republican Party of Virginia, 517 U.S. 186, ---- n. 18, 116 S.Ct. 1186, 1234 n. 18, 134 L.Ed.2d 347 (1996) (Thomas, J., dissenting) (emphasis added) ("We are not free to construe statutes by wondering about what Congress 'would have wanted to enact.' There are myriad reasons why measures that 'a Congress' ... might 'wan[t] to enact' never become law. We must look to the extant text of the statute and see what Congress has in fact, and not in theory, enacted."); W. Va. Univ. Hosp., Inc. v. Casey, 499 U.S. 83, 98, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68 (1991) ("[T]he purpose of a statute includes not only what it sets out to change, but also what it resolves to leave alone. The best evidence of that purpose is the statutory text adopted by both Houses of Congress and submitted to the President.") (citations omitted). Moreover, although Title IX has been on the books for more than twenty years (since 1972), our Nation's legislature has not seen fit in that period of time to amend the law by inserting language that would even suggest that agency principles govern. In light of Congress' obvious satisfaction with the law as it now stands, we should be most reluctant to go searching for scraps of legislative history to support expansion of the statute.
 
 
 106
 The mere morsel of legislative history quoted by the dissent pre-dates Meritor's holding that "agency principles" apply in Title VII cases and thus cannot be construed as endorsing the extension of Meritor's holding to the Title IX context (the argument implicit in the dissent). The quoted passage says nothing about sexual harassment, for the focus of congressional concern in 1972 was on the issue of discrimination in hiring/firing and advancement (i.e., glass ceiling). There was a paucity of recognition, compared with today's acceptance, that sexual harassment is a form of sex discrimination. Far from stating that "agency principles" should be used to determine an educational institution's liability for such harassment, the House Report simply states:
 
 
 107
 One of the single most important pieces of legislation which has prompted the cause of equal employment opportunity is Title VII of the Civil Rights Act of 1964.... Title VII, however, specifically excludes educational institutions from its terms. [Title IX] would remove that exemption and bring those in education under the equal employment provision.
 
 
 108
 H.R.Rep. No. 554, 92d Cong., 2d Sess., reprinted in 1972 U.S.C.C.A.N. 2462, 2512. This brief passage merely reflects the considered view of Congress (some twenty-five years ago) that the equal employment provisions of Title VII ought to be extended to employees in educational settings. It provides not a scintilla of evidence of congressional intent on the issue before this Court (i.e., the standard of institutional liability under Title IX), and certainly should not be used in an attempt to circumvent the inescapable fact that the text of the statute does not refer to "agents" and thus provides no basis for the use of agency principles. So when my dissenting colleague declares that "today's majority ignores that expression of congressional intent in construing Title IX," she would do well to remember that "only the most extraordinary showing of contrary intentions from [legislative history] would justify a limitation on the 'plain meaning' of the statutory language." Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984) (emphasis added). This is not one of those "rare and exceptional circumstances" wherein legislative history (a scant history at that) will override the unambiguous words of Congress. Id. (quoting TVA v. Hill, 437 U.S. 153, 187, n. 33, 98 S.Ct. 2279, 2298, n. 33, 57 L.Ed.2d 117 (1978)).
 
 
 109
 The author of the dissent opines that our holding today is "stingy" in that it fails to give Title IX "a sweep as broad as its language." North Haven Bd. of Ed., 456 U.S. at 521, 102 S.Ct. at 1918. I disagree. The analysis of institutional liability set forth in the majority opinion gives Title IX a logical interpretation as broad as the language of that statute will allow, because we in the majority recognize that this Court must not expand, much less enlarge upon, the scope of a statute unless the Supreme Court directs us to do so, or Congress has done so on its own initiative. As the majority opinion makes clear, there is no basis in Title IX for the application of agency principles. As judges, we are obligated to follow the law. We do not have a license to amend federal statutes (even "remedial" ones), for that responsibility clearly lies with the Legislature. In short, "we resolve[ ] ... ambiguit[ies] not by invoking some policy that supercedes the text of the statute," W. Va. Univ. Hosp., Inc., 499 U.S. at 98-100, 111 S.Ct. at 1147, but rather by limiting ourselves to that meaning which a given text will reasonably bear.
 
 
 110
 I wish to emphasize that I am unalterably opposed to sexual harassment, which is both intolerable and wrong. I am particularly sympathetic to those unfortunate young persons in our society who are or have been sexually abused or harassed by people senior to them in age, and supposedly wiser, who should know better than to engage in such reprehensible activity. Sadly, as Rosa H. observes, "it is increasingly evident ... that sexual harassment and molestation of students by teachers is not uncommon." 106 F.3d at 657. Teachers entrusted with the care of our children must never, under any circumstances, use their position of trust and authority to gratify themselves sexually or for any other improper purpose. I am confident that all members of this Court agree that such conduct is not only morally repugnant, but breaks a sacred trust embodied in the time-honored phrase "in loco parentis." That said, however, I note that the question before us is not the factual one of whether we believe Smith's allegations about Rager. Rather, we are called upon to decide only the legal question of when and under what circumstances an educational institution (i.e., the school district) may be held liable for sexual harassment under Title IX.
 
 
 111
 Because Title IX, unlike Title VII, does not refer to "agents," the majority on this panel today has wisely concluded that "agency principles" do not apply in determining whether an educational institution should be held liable for alleged acts of harassment by a schoolteacher. Recognizing that "Title IX requires a showing of actual, intentional discrimination on the part of the school district," id., we have concluded that the "actual knowledge" standard set forth by the Fifth Circuit should be employed in determining an educational institution's liability in Title IX sexual harassment cases. Under this standard, "a student cannot recover from the school district under Title IX unless the school district actually knew that there was a substantial risk that sexual abuse would occur." Id. at 653. As the Rosa H. court summarized:
 
 
 112
 a school district can be liable for teacher-student sexual harassment under Title IX only if a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the employee and the power to take action that would end such abuse and failed to do so.
 
 
 113
 Id. at 660 (emphasis added).
 
 
 114
 It is certainly worth noting some of the pitfalls that we will avoid by adopting the reasoned approach set forth in the majority opinion. If we were to open the "Pandora's box" of "agency principles" in the Title IX context--without a basis in the statute or Supreme Court case law for doing so--I am certain that the myriad agency concepts set forth in the Restatement (2d) of Agency would soon be enlisted in the cause and ever-increasing drumbeat of making educational institutions strictly liable for sexual harassment (and at what expense to taxpayers?). As noted in Rosa H., agency principles could be interpreted by the courts to create liability for school districts "in virtually every case in which a teacher harasses, seduces, or sexually abuses a student." 106 F.3d at 655 (emphasis added). This is a potential danger because, "in addition to § 219(2)(b) of the Restatement, which makes a master liable when he acts negligently, courts could rely on § 219(2)(d), which creates liability whenever the servant [i.e., teacher] is 'aided in accomplishing the tort by the existence of the agency relationship.' " Id. Since it is the school system that puts the teacher in a position which allows him to allegedly harass students, I am confident that crusading litigators and/or creative courts would attempt to rely on § 219(2)(d) to establish almost unlimited Title IX liability, thereby possibly creating a devastating financial impact on many school districts that are today suffering from inadequate facilities, outdated equipment, and shrinking budgets. The high costs of insuring against teacher-student sexual harassment, not to mention the steep litigation expenses associated with defending allegations of such conduct, would only be passed on to school districts nation-wide and, in turn, public school students (in the form of further cost-cutting), under the dissent's "knew or should have known" standard. In fact, the price paid for institutional harassment would inevitably be higher than that borne by employers for the same conduct occurring in the workplace since Title IX, unlike Title VII, is not tempered by statutory provisions that can shield defendant-institutions from excessive liability. For example, whereas Title VII includes a statutory ceiling on recoverable monetary damages, see 42 U.S.C. § 1981a(b)(3), Title IX contains no such restriction. Equally damaging, however, would be the effect of a relaxed standard of liability, like the one proposed by the dissent, on educational opportunities for female students in our secondary schools. That is, how many male teachers would be willing to select females as student assistants and risk allegations of sexual misconduct if simply attending school athletic functions, closing doors during class, and walking down school corridors (or in other public areas) with them raised rumors and/or suspicions of impropriety? I would venture to guess very few. But we need not burden ourselves with policy considerations, for they are "for Congress to weigh, and we are not free to ignore the language ... of Title IX even if we were to disagree with the legislative choice." North Haven Bd. of Educ., 456 U.S. at 535 n. 26, 102 S.Ct. at 1925 n. 26. Absent direction from either Congress or the Supreme Court to analyze agency-law questions such as whether, and if so, how §§ 219(2)(b) and 219(2)(d) apply in the Title IX context, we certainly are not obligated to engage in such analysis and should decline the dissent's invitation to do so.
 
 
 115
 My dissenting colleague's characterization of the majority opinion as "stingy" might, at first glance, strike some as being derogatory in nature, but in my view it only underscores the appropriate caution with which we must approach those important areas of law that neither the United States Congress nor the Supreme Court has seen fit to address, or much less for which they have set forth guiding parameters. If we are to avoid exceeding our role as a reviewing federal appellate court, in contradistinction to a law-making body, we must allow either Congress or the Supreme Court to be the final arbiter on the question of institutional liability for sexual harassment under Title IX. Until such time as the Nation's legislature expresses a clear intent that educational institutions under Title IX may be held liable for student-teacher sexual harassment under "agency principles," or until the High Court interprets Title IX to require the application of agency principles, we should not impose such a requirement by judicial decree, as the majority opinion recognizes.
 
 
 116
 ILANA DIAMOND ROVNER, Circuit Judge, dissenting.
 
 
 117
 At the outset of Heather Smith's senior year at Southport High School, gym teacher Steve Rager persuaded Heather to serve as his student assistant during her study hall period. That meant that Heather would work exclusively for Rager in his private office near the school's gymnasium. At the time Rager made his proposal, Heather already was assigned to work as a student assistant for another Southport teacher, and Rager therefore arranged through an assistant principal for the switch to be made. Although most student assistants at Southport were given general typing and filing responsibilities, Rager had other things in mind for Heather. September had not yet passed when Rager made the first of many advances on his student assistant, asking Heather whether he could give her a kiss. When Heather met Rager's question with stunned silence, he handed her a Hershey's Kiss and joked "You thought I was meaning the real thing." Having thus gained the upper hand, Rager told Heather "You wanted the real thing, didn't you?" and kissed her. This episode, like those that would follow it, occurred in Rager's office during the class period that Heather was assigned to work as his student assistant.
 
 
 118
 In the ensuing weeks, Rager became increasingly bold with Heather, putting his hand up her skirt, and telling her that he wanted to be her teacher, that he wanted to teach her everything he could about sex. Near the end of September, Rager took Heather into the bathroom of his private office and had intercourse with her. Prior to that encounter, the seventeen-year-old Heather had had no sexual experience. Thereafter, Rager had intercourse with Heather approximately twice a week during the class period she was assigned to work as his student assistant. As the majority points out, Heather did not initially resist Rager's advances, but she did refuse to perform oral sex, pulling away when he pushed her head downward. His confident response to her reluctance was: "eventually you will do it," and eventually she did.
 
 
 119
 Yet as October approached, Heather became disturbed and confused about these initial sexual experiences. She felt dirty when she was required to go to her next class, but she was afraid to spurn Rager's advances. Rager realized that Heather was upset, and at one point, he even called her at a swim team practice to make sure that everything was alright.
 
 
 120
 In January of the following year, Heather finally summoned the courage to discuss with Rager her desire to discontinue their sexual relationship. Concerned that they remain friends, Heather asked Rager whether he would understand and still be her friend if they stopped having sex. Rager assured her that he would. After that conversation, however, Rager still initiated sexual intercourse with Heather, and the relationship therefore continued into July, when Heather told Rager that she wanted it to stop. Although she agreed to "one last time" at Rager's urging, the relationship ended shortly thereafter.
 
 
 121
 No one at Southport High School ever saw Rager and Heather having sex, but the two were frequently seen together on school grounds. For example, they frequently left the school together during the lunch hour, and they once had lunch off school grounds with another teacher. On that occasion, Rager placed his arm around Heather and hugged her in a joking manner. In addition, Rager frequently walked Heather toward her next class after their time together, and he once personally explained to the teacher of that class that he had held Heather over fifteen minutes. On other occasions, Rager simply gave Heather a note for the teacher when he caused her to be late. Rager once also indicated in the presence of an assistant school principal that he wanted to be twenty years younger so that he could marry Heather. That same assistant principal later excused Heather early from the lunchroom so that she could meet Rager at his office, but not without first asking her in a joking manner what was going on down there.
 
 
 122
 Finally, Rager was a constant presence at school swim meets in which Heather participated. In the presence of Heather's coaches and teammates, Rager would rub down Heather's shoulders. He also would work individually with Heather after practice on her swimming strokes. Some members of the swim team wondered, and discussed amongst themselves, why Rager and Smith spent so much time together.
 
 
 123
 These are the relevant facts when construed in the light most favorable to Smith, and it should come as no surprise that the district court found these facts sufficient to raise a genuine issue on summary judgment as to whether Smith had been sexually harassed in violation of Title IX. After first rejecting defendants' astonishing argument that the harassment in this case was "not unwelcome," the district court explained that:
 
 
 124
 A reasonable jury could conclude that Rager's actions were facilitated by his authority as a teacher and coach at Southport High School. The evidence is that he hand-picked Smith for the position of student assistant, assigned her no work, and used the time they spent together for seduction and sex. His private office and bathroom were instrumental to his designs. He wrote notes to excuse Smith's late arrival to her sixth period class. He even played up his position of authority by styling himself a "teacher" of sex.
 
 
 125
 A reasonable jury could also find that the School Defendants were negligent. The evidence is that Rager was allowed to select a female senior as his student assistant and have her spend fifth period alone with him in his private office with the door closed. No one monitored this situation. Rager also made comments in front of other teachers and [Southport's assistant principal] indicating an inappropriate personal interest in Smith. He hugged her in their presence. He favored her with special attention at swim practice and meets. No one reported, or even questioned, this conduct. For most of the school year, there was no sexual harassment policy in place, and no person identified for the benefit of students and employees as the Title IX coordinator. See 34 C.F.R. § 106.8. These facts could support the conclusion that the School Defendants should have known about the sexual harassment and taken prompt action to stop it.
 
 
 126
 (R. 116 at 16-17.)[1]
 
 A.
 
 127
 Before addressing the legal issue presented in this case, I must first respond to the accusation of my concurring colleague that I have premised this dissent "on factual, as opposed to legal, grounds." (See ante, Concurring Op. at 1035.) Because this case comes to us on summary judgment, we are obliged to construe the factual record in the light most favorable to Smith, granting her the benefit of all reasonable inferences to be drawn from the evidence. E.g., Venters v. City of Delphi, 123 F.3d 956, 961-62 (7th Cir.1997). In my judgment, the majority's description of the disturbing factual record in this case is not fully consistent with that obligation. We do not learn from the majority opinion, for example, that Rager and Smith were consistently seen together on school grounds, that Rager once appeared in person and on other occasions wrote notes to excuse Smith's late arrival to her next class, or that Rager made comments in the presence of Southport officials indicating an inappropriate personal interest in Smith. The district court referenced all of these facts, among others, in finding that a factual question was raised on summary judgment as to what Southport officials knew or reasonably should have known. (R. 116 at 16-17.) My point in describing those facts in this dissent is to emphasize that the debate between us over the appropriate standard for institutional liability under Title IX is not an academic one--it is outcome-determinative here, because there is evidence from which a reasonable jury could find that Southport officials were negligent and that they should have known of Rager's harassment.[2]
 
 B.
 
 128
 With those matters behind me, I turn, finally, to the important legal question raised in this appeal. As I said, the district court, having construed the evidence in the light most favorable to Smith, found that a jury must decide whether Southport officials were negligent, and thus what those officials knew or reasonably should have known. The majority, however, rejects that court's conclusion and deprives Smith of a trial because it finds no evidence that any official at Southport High School with supervisory authority over Rager had "actual knowledge" of his disturbing misconduct. (Ante, Maj. Op. at 1034.) Yet in opting for that "actual knowledge" standard, my colleagues eschew the more widely-accepted negligence or "knew or should have known" standard traditionally applied in hostile environment sexual harassment cases under Title VII. See Jansen v. Packaging Corp. of Am., 123 F.3d 490, 494-95 (7th Cir.1997) (en banc) (per curiam), petition for cert. filed, No. 97-569 (U.S. Sept. 29, 1997); Guess v. Bethlehem Steel Corp., 913 F.2d 463, 464-65 (7th Cir.1990). Bucking the clear weight of circuit authority on the issue, the majority instead chooses to align this court with the Fifth Circuit, which before today had stood alone in its overly restrictive interpretation of the reach of Title IX. See Rosa H. v. San Elizario Indep. Sch. Dist., 106 F.3d 648, 652-53 (5th Cir.1997) (rejecting "knew or should have known" standard and requiring actual knowledge of harassing conduct). Because I disagree with the Fifth Circuit and instead agree with all of the other circuits to have considered the question that Title VII's "knew or should have known" standard must apply in this type of Title IX case (see Lipsett v. University of Puerto Rico, 864 F.2d 881, 901 (1st Cir.1988); Kracunas v. Iona College, 119 F.3d 80, 88 & n. 6 (2d Cir.1997) (disapproving of Fifth Circuit's decision in Rosa H.); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 248-49 (2d Cir.1995); Doe v. Claiborne County, Tennessee, 103 F.3d 495, 514-15 (6th Cir.1996); Kinman v. Omaha Pub. Sch. Dist., 94 F.3d 463, 469 (8th Cir.1996); see also Nicole M. v. Martinez Unified Sch. Dist., 964 F.Supp. 1369, 1377-78 (N.D.Cal.1997) (rejecting Fifth Circuit's decision in Rosa H. and applying "knew or should have known" standard)),[3] and because it is clear that Smith would be entitled to a trial under that more generous standard, I must respectfully dissent.
 
 
 129
 Much ink has already been spilled addressing the issue of the appropriate standard for institutional liability under Title IX, and because the Supreme Court must ultimately resolve the division amongst the circuits, I shall attempt to be brief. The rationale for applying Title VII's "knew or should have known" standard in a hostile environment sexual harassment case under Title IX has been set forth in the decisions I have cited, as well as in the vacated panel decision of the Eleventh Circuit in Davis v. Monroe County Bd. of Educ., 74 F.3d 1186, 1190-95 (11th Cir.), vacated, reh'g en banc granted, 91 F.3d 1418 (11th Cir.1996), on reh'g, 120 F.3d 1390 (11th Cir.1997) (en banc). I wish to emphasize but a few points here.
 
 
 130
 First, in addition to its citation of Meritor in Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 75, 112 S.Ct. 1028, 1037-38, 117 L.Ed.2d 208 (1992) (see ante, Maj. Op. at 1024-25), which I find to be far more significant than my colleagues are willing to admit,[4] the Supreme Court has instructed the lower courts that, in order to give Title IX " 'the scope that its origins dictate, we must accord it a sweep as broad as its language.' " North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 521, 102 S.Ct. 1912, 1918, 72 L.Ed.2d 299 (1982) (quoting United States v. Price, 383 U.S. 787, 801, 86 S.Ct. 1152, 1160-61, 16 L.Ed.2d 267 (1966)). Today's stingy interpretation of this broad remedial statute cannot be said to honor that command. In fact, in focusing so obsessively on the absence of the word "agent" from the definition of a "program or activity" under Title IX, the majority ignores both the structure of the statute and the context of the Supreme Court's discussion in Meritor of the significance of that term's inclusion in Title VII. I begin with the second point.
 
 
 131
 The majority clearly believes that the omission of "agent" from Title IX makes the statute narrower in scope than it would be if that term were included. But in Meritor, the Supreme Court viewed "agent" as a limiting term, explaining that "Congress' decision to define 'employer' to include any 'agent' of an employer surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986) (citation omitted). As two commentators recently observed, in fact, "the Court [in Meritor] was choosing between agency principles and strict liability for hostile environment sexual harassment, not between agency principles [and] no liability unless formal discriminatory action is taken by an employer's board of directors." Verna L. Williams & Deborah L. Brake, When a Kiss Isn't Just a Kiss: Title IX and Student-to-Student Harassment, 30 Creighton L.Rev. 423, 450 (1997). And although those commentators agree with me that Title VII principles must apply in a hostile environment sexual harassment case under Title IX, they observe that "if any meaning is to be read into the absence of the word 'agent' from Title IX, it would be to extend Title IX liability further than Title VII to hold institutions strictly liable for discriminatory conduct without regard to agency principles." Id.; see also id. at 451-52. It is therefore clear to me that both the majority's decision today and the Rosa H. decision that it follows are premised on a fundamental misreading of Meritor.
 
 
 132
 Even more importantly, however, the majority's "agency" argument also misapprehends the language and structure of Title IX itself. Although a casual reader of the majority opinion may be left with the impression that Title IX outlaws discrimination by a program or activity receiving federal funds (see, e.g., ante, Maj. Op. at 1023 & 1026), the statutory language actually prohibits sex discrimination "under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). Unlike Title VII, then, which focuses on the discriminator, making it unlawful for an employer to engage in certain prohibited practices (see 42 U.S.C. § 2000e-2(a)), Title IX is drafted from the perspective of the person discriminated against. That statute names no actor, but using passive verbs, focuses on the setting in which the discrimination occurred. In effect, the statute asks but a single question--whether an individual was subjected to discrimination under a covered program or activity.[5] And Title IX then broadly defines a "program or activity" to include "all of the operations of ... a local education agency ..., system of vocational education, or other school system." 20 U.S.C. § 1687 (emphasis added). Under the statutory language, then, the only relevant question in this case is whether the program under which Heather Smith was authorized to serve as a student assistant during one of her class periods for a teacher at Southport High School was part of "the operations of" her local school system. Because the answer to that question is so obvious, my colleagues never answer it. They instead reframe the question and ask whether Smith was harassed "by" the program or activity. But the statutory language does not make that a requirement; "under" cannot be read to mean "by" in this context. And because Title IX as drafted includes no actor at all, it necessarily follows that the statute also would not reference "agents" of that non-existent actor. See Davis v. Monroe County Bd. of Educ., 120 F.3d 1390, 1407 (11th Cir. 1997) (en banc) (Black, J., concurring) ("The statute simply does not specify what relationship, if any, the perpetrator of an underlying act of sexual harassment must have to the federally-funded educational institution to trigger Title IX liability."). Thus, in light of the statutory language, the absence of the word "agent" from Title IX cannot be accorded the overriding significance my colleagues attach to it today. Cf. id. at 1412 (Barkett, J., dissenting) ("The absolute prohibition contained in the text is framed solely in terms of who is protected. The identity of the perpetrator is simply irrelevant under the language.").[6]
 
 
 133
 Despite the differing structures of the two statutes, however, Title IX's legislative history suggests that Congress intended courts to look to Title VII in interpreting its anti-discrimination provisions. The House Report provides in pertinent part as follows:
 
 
 134
 One of the single most important pieces of legislation which has prompted the cause of equal employment opportunity is Title VII of the Civil Rights Act of 1964.... Title VII, however, specifically excludes educational institutions from its terms. [Title IX] would remove that exemption and bring those in education under the equal employment provision.
 
 
 135
 H.R.Rep. No. 554, 92d Cong., 2d Sess., reprinted in 1972 U.S.C.C.A.N. 2462, 2512. Several circuits have highlighted this statement in concluding that the standard of liability employed in a hostile environment case under Title VII must also apply in a hostile environment case under Title IX. E.g., Lipsett, 864 F.2d at 897; Doe, 103 F.3d at 514-15; see also 6 Arthur Larson & Lex K. Larson, Employment Discrimination § 118.06, at 118-11 (2d ed.1994). Yet today's majority ignores that expression of congressional intent in construing Title IX to provide significantly less protection against sex discrimination to those within its ambit than that afforded to individuals covered by Title VII. I find that to be a particularly regrettable result in light of the fact that Title IX covers those in our society who are most vulnerable to this type of discrimination--young women like Heather Smith.[7]
 
 
 136
 The majority, in my view, is also too quick to dismiss the position of the United States Department of Education's Office for Civil Rights ("OCR"), which is charged with administering Title IX. As emphasized by the Sixth Circuit in Doe, the OCR has long endorsed the view "that Title VII agency principles should apply to Title IX cases." Doe, 103 F.3d at 514 (citing Office for Civil Rights, U.S. Dep't of Educ., Sexual Harassment: It's Not Academic 2 (1988)). Indeed, in its recently published "final policy guidance" on the issue of sexual harassment under Title IX, the OCR specifically notes that the Fifth Circuit's decision in Rosa H., as well as that court's earlier decisions in Rowinsky v. Bryan Indep. Sch. Dist., 80 F.3d 1006 (5th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 165, 136 L.Ed.2d 108 (1996), and Canutillo Indep. Sch. Dist. v. Leija, 101 F.3d 393 (5th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 2434, 138 L.Ed.2d 195 (1997), are inconsistent with the OCR's "longstanding policy and practice" under Title IX. Office for Civil Rights, U.S. Dep't of Educ., Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed.Reg. 12034, 12036 (Mar. 13, 1997); see also id. at 12039 n. 23 & 12042 n. 65 (expressly disagreeing with Rosa H.). In that "final policy guidance," moreover, the OCR reaffirms its long-held view that the agency principles traditionally applied to hostile environment sexual harassment cases under Title VII must apply to similar claims under Title IX, and that a school district must be held responsible for a sexually hostile environment if it "knew or should have known" of the harassment and failed to take corrective action. Id. at 12039 & 12042. And as even the Fifth Circuit has acknowledged, the OCR's interpretation of Title IX is entitled to " 'appreciable deference' " from the courts, as the OCR is the agency charged with the administration of that statute. Rosa H., 106 F.3d at 658 (quoting Rowinsky, 80 F.3d at 1015 n.20); see also North Haven Bd. of Educ., 456 U.S. at 522 n. 12, 102 S.Ct. at 1918 n. 12; Meritor, 477 U.S. at 65, 106 S.Ct. at 2404-05 (discussing deference owed to EEOC Guidelines).[8] Because the OCR's view on this issue is consistent with the decision of every circuit but the Fifth, as well as with the language, purpose, and legislative history of Title IX, I would adopt its position here.
 
 
 137
 Finally, the majority emphasizes that because Title IX was enacted pursuant to Congress' spending power, the statute applies only to intentional discrimination. And the discrimination here fails to qualify, we are told, because it involved Rager alone, without the actual knowledge or participation of school officials. (See ante, Maj. Op. at 1028.) With all due respect, however, I would have thought that argument foreclosed by Franklin itself. There, the Supreme Court explained that:
 
 
 138
 The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. This notice problem does not arise in a case such as this, in which intentional discrimination is alleged. Unquestionably, Title IX placed on the Gwinnett County Public Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought to proscribe.
 
 
 139
 503 U.S. at 74-75, 112 S.Ct. at 1037. Although the majority insists that this passage does not mean what it says because the school officials in Franklin knew of the alleged harassment (ante, Maj. Op. at 1032-33), it is clear that the Court in Franklin was focusing on the teacher's actions alone, and not on the school administrators' knowledge, in describing the conduct as "intentional." See Doe v. Petaluma Sch. Dist., 949 F.Supp. 1415, 1418 (N.D.Cal.1996) ("the Franklin Court did not refer to or expressly rely upon [the administrators'] knowledge and inaction when characterizing the plaintiff's claim as one for intentional discrimination."). Franklin therefore indicates that because hostile environment sexual harassment qualifies as "intentional discrimination," that Spending Clause requirement is met irrespective of the school district's knowledge or lack thereof. See Davis, 120 F.3d at 1401 ("The terms of Title IX gave educational institutions notice that they must prevent their employees from themselves engaging in intentional gender discrimination."); Doe, 949 F.Supp. at 1419-22 (Franklin's discussion of "intentional discrimination" means that sexual harassment qualifies); Canutillo, 101 F.3d at 406 (Dennis, J., dissenting) ("when the Supreme Court referred to 'intentional discrimination' in Franklin, it was referring to any form of discrimination other than disparate impact discrimination"). Franklin does not even remotely say what my colleagues hold today--that the intentional discrimination requirement can be satisfied only where school administrators had actual knowledge of the harassment and failed to stop it.
 
 
 140
 For these reasons, as well as for the additional reasons given in the circuit opinions I have cited, I would employ the negligence or "knew or should have known" standard traditionally applied to hostile environment sexual harassment claims under Title VII to Heather Smith's claim under Title IX. As the district court determined, Smith is plainly entitled to a trial under that standard, and I must therefore respectfully dissent from the majority's decision to deprive her of that trial.
 
 
 
 [1]
 Mennone v. Gordon, 889 F.Supp. 53, 56 (D.Conn.1995), concluded otherwise, holding that an individual could be sued, but only if the individual exercised a sufficient level of control over the program or activity. We address this point, infra at 1020-21. Mann v. University of Cincinnati, 864 F.Supp. 44, 47 (S.D.Ohio 1994), also concluded that a Title IX claim could be brought against both an educational institution and one of its officials. Mann supported this conclusion by stating: "In [Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) ], the Plaintiff sued both the educational institution and one of its officials, and the Supreme Court did not say the law applied only to the institution." But the court in Mann did not recognize that at the circuit court level in Franklin v. Gwinnett, 911 F.2d 617, 622 (11th Cir.1990), the plaintiff had abandoned on appeal her claim against the individual by failing to support her position that an individual could be liable under Title IX. In fact, many Title IX cases that have reached the appellate level originally sought recovery against individuals, but the individual claims were dismissed and the dismissal was not challenged on appeal. Rosa H. v. San Elizario Indep. Sch. Dist., 106 F.3d 648, 651 (5th Cir.1997); Rowinsky, 80 F.3d at 1010 n. 6
 
 
 [2]
 In Mennone, the court recognized the language of Title IX demands that a defendant exercise control over the "program or activity" to be liable under Title IX. The court then concluded that a teacher has such control. 889 F.Supp. at 57-58. However, the court in Mennone reached this conclusion without determining whether state law granted the teacher administrative control over the "program or activity," as is required by Title IX. In Indiana, a teacher does not have that power
 
 
 [3]
 Even if a principal or assistant principal, in their official capacity, maintained administrative control over the program or activity, an official capacity suit " 'generally represent[s] only another way of pleading an action against an entity of which an officer is an agent.' ... As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity." Nelson v. Temple Univ., 920 F.Supp. 633, 637 (E.D.Pa.1996) (quoting Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 3104-05, 87 L.Ed.2d 114 (1985)). Because Smith's suit is also against the entity, i.e., the School District and School Board, her claims against the principal and assistant principal, in their official capacities, are redundant
 
 
 [4]
 Murray involved a situation of alleged sexual harassment by a patient at the teaching institution, rather than someone employed by the educational institution. The court in Murray declined to address liability of an educational institution for hostile environments created by a third party. 57 F.3d at 250. The Fifth Circuit in Rowinsky explicitly addressed this issue, holding that peer sexual harassment was not actionable under Title IX, "absent allegations that the school district itself directly discriminated based on sex." 80 F.3d at 1008
 
 
 [5]
 42 U.S.C. § 2000e(b) states:
 The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person....
 (Emphasis added.)
 
 
 [6]
 As we explained in Guess v. Bethlehem Steel Corp., 913 F.2d 463, 464-65 (7th Cir.1990), the use of the phrase "respondeat superior" to describe liability based on the "knew or should have known" standard is misplaced. Nonetheless, these cases make clear that the "any agent" language of Title VII, the ADA, and the ADEA provides a statutory basis for applying agency principles
 
 
 [7]
 We have also noted that the Federal Tort Claims Act creates vicarious liability. Sterling v. United States, 85 F.3d 1225, 1227 (7th Cir.1996). But as in the case of Title VII, the ADA, and the ADEA, Congress expressed its intent that the FTCA create liability vicariously based on the negligence of governmental employees. 28 U.S.C. § 2679
 
 
 [8]
 At least four circuits have applied agency principles to Title IX cases. While that force of numbers may seem impressive at first glance, a careful examination shows that the cumulative reasoning in those cases is very limited and conclusory. Judge Higginbotham writing for the Fifth Circuit in Rosa H. concludes otherwise with a much more thorough analysis, which underscores that in numbers there is not necessarily strength. The other circuits' opinions offer minimal legal analysis in adopting the "knew or should have known" standard employed in Title VII cases
 
 
 [9]
 Without considering the specific question of agency principles, the Tenth Circuit noted in Mabry v. State Board of Community Colleges and Occupational Education, 813 F.2d 311, 316 n. 6 (10th Cir.1987), that "[b]ecause Title VII prohibits the identical conduct prohibited by Title IX, i.e., sex discrimination, we regard it as the most appropriate analogue when defining Title IX's substantive standards...."
 
 
 [10]
 They likewise read too much into Franklin's citation to Meritor. See supra at 1022-23
 
 
 [11]
 In fact, the district courts are hopelessly at odds in adopting a standard for a school district's liability for sexual harassment by teachers against students under Title IX. See Kinman, 94 F.3d at 468, which summarized the four standards of liability under Title IX adopted by various district courts: (1) agency principles of negligence or recklessness; (2) knowledge or direct involvement by the school district; (3) Title VII's "knew or should have known" standard; and (4) strict liability
 
 
 [12]
 Citing a law review article, the dissent also claims that the Supreme Court in Meritor viewed Title VII's use of the word "agent" as a term meant to avoid strict liability by limiting Title VII liability to that found under agency principles. But the choice in Meritor was not between agency principles and strict liability. It was between strict liability and the "knew or should have known" (negligence) standard the Court adopted. Agency principles define the relationship between principals and their agents, as well as establish rules for a principal's liability to third parties. Some of those rules create strict liability, and others create liability only for negligence. In fact, the dissent itself applies some agency principles (abuse of authority and apparent authority) which create strict liability. Thus, the choice presented is not between agency principles and strict liability, but between different agency principles, some of which result in strict liability and some of which result in liability only for negligence
 This creates several problems. While this theory disclaims strict liability, in fact some of the agency principles it adopts create strict liability. Because Title IX is Spending Clause legislation, grant recipients receive federal funds by agreement. Title IX cannot create strict liability for grant recipients (see infra at 1028-33). Yet certain agency applications would do just that. For obvious good reasons Congress did not incorporate agency law in its mandate under Title IX. If Title VII did not include "agents" in its definition of employer, the Supreme Court in Meritor would not have had a statutory basis for adopting agency principles. See discussion of Monell infra at 1027-28. This obvious distinction between Title VII and Title IX cannot be rationalized into extinction in order to arrive at a conclusion Congress did not direct.
 
 
 [13]
 The Fifth Circuit has since reaffirmed its holding in Rosa H. in Doe v. Lago Vista Indep. Sch. Dist., 106 F.3d 1223 (5th Cir.1997)
 
 
 [14]
 The dissent claims that this interpretation of Title IX is narrow and even contrary to the Supreme Court's directive that Title IX be accorded "a sweep as broad as its language." But without any statutory language indicating that agency principles should apply, there is nothing to sweep
 For several reasons we also cannot rely on a House Report cited by the dissent as evidence of Congress' intent that Title VII's "knew or should have known" standard should apply to Title IX cases. First, "the plain language of a statute is the most reliable indicator of congressional intent," Baker v. Runyon, 114 F.3d 668, 670 (7th Cir.1997) (quoting Time Warner Cable v. Doyle, 66 F.3d 867, 876 (7th Cir.1995)), and had Congress intended agency principles to apply it could easily have included "agents" in the definition of "program or activity," as it did in Title VII's definition of "employer." Second, this legislative comment predates Meritor and the adoption of agency principles in the Title VII context, so it cannot be said that Congress clearly intended those standards to apply to Title IX. And finally, the excerpt does not concern student suits for sex discrimination but only indicates an intent to protect employees of educational programs from sex discrimination, because they had been explicitly excluded from such coverage by the terms of Title VII.
 
 
 [15]
 The dissent seems to assert that because Title IX was written in the passive voice, the only question is whether an individual was subjected to discrimination under a covered program or activity (post at 1047). If the answer is "yes" the program pays. This goes well beyond the "knew or should have known" standard of Title VII. If all that is required is that the discrimination occur under a covered program or activity, then there would be no need to adopt a standard for institutional liability--liability would be absolute. Not only has no court adopted such an approach, but it would be impermissible: Title IX is Spending Clause legislation, and as such supports a monetary remedy only where discrimination is intentional. (See infra at 1028-33.)
 
 
 [16]
 Smith also argues that the School Board and School District are liable under Title IX because they failed to train the faculty and students on what constitutes "sexual harassment," and to inform teachers that teacher/student relationships are prohibited. Because a grant recipient cannot be held liable under Title IX for negligence, we need not consider these additional claims of negligence, other than to say that teachers, who have acted in loco parentis since time immemorial, are well aware that parents and guardians have entrusted them with the care of their children and that they must never, under any circumstances, use this position of trust and authority to gratify themselves sexually or for any other improper purpose. In light of this common knowledge concerning the role of teachers, the mere absence of formal procedures and policies against sexual harassment (i.e., failing to state the obvious) cannot constitute negligence
 
 
 [17]
 Smith correctly notes that "[a] teacher is not going to be acting within the course of his employment when sexually harassing a student," and therefore does not rely on § 219(1) of the Restatement which creates vicarious liability for torts committed within the scope of employment
 
 
 [18]
 While the standard to state a claim under Title IX and the standard to recover damages are "analytically distinct," Franklin, 503 U.S. at 65-66, 112 S.Ct. at 1032-33 (citing Davis v. Passman, 442 U.S. 228, 239, 99 S.Ct. 2264, 2273-74, 60 L.Ed.2d 846 (1979)), the lack of a monetary remedy under Title IX negates any rationale for applying agency principles in the first instance
 
 
 [1]
 I shall refer to the plaintiff, Heather Smith, as "Smith" throughout the duration of this opinion
 
 
 [2]
 With the exception of one incident in which he allegedly suggested fellatio
 
 
 [3]
 When I refer to the language of Title VII and Title IX being "similar," I do so in a very general sense. No one will dispute that the text of the two statutes differs with respect to the use of the term "agents" in Title VII and the absence thereof in Title IX
 
 
 [4]
 The differences between the regulations promulgated under Title VII and Title IX, respectively, are also significant. As the Rosa H. Court noted:
 Title VII regulations state forthrightly that "an employer ... is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment...." 29 C.F.R. § 1604.11. Title IX, by contrast, does not create any administrative body to regulate private claimants' rights, and the regulations promulgated under Title IX make no mention of sexual harassment. See 34 C.F.R. §§ 106.1-106.71 (Title IX regulations).
 106 F.3d at 657 (emphasis added).
 
 
 [1]
 On the issue of welcomeness, the district court concluded that a reasonable jury could find that Rager's conduct was unwelcome:
 At the time of the events in question, Smith was seventeen years old, an unemancipated minor subject on school days to the supervision and control of school officials. Rager, on the other hand, was a teacher at Southport High School, and had been one for as long as Smith had been alive. Prior to making any sexual advances, Rager convinced Smith to become his student assistant, with the result that she was solely at his disposal for one class period every school day. He then launched what a reasonable jury could view as a carefully planned seduction. He employed every available advantage to get what he wanted, including his greater knowledge and experience, his position of trust and authority, and his private office and bathroom. Instead of using Smith to assist him with his professional duties, he used her to satisfy his desire for quick, secret sex between classes.
 (Id. at 10-11 (citation & footnote omitted).) The summary judgment record fully supports the district court's view; Heather Smith was a child of seventeen, after all, and Rager a teacher as well as Smith's supervisor in her role as student assistant. Their respective roles therefore greatly curtailed Smith's ability to meaningfully consent to or to decline the sexual involvement. The undisputed evidence reveals, moreover, that it was Rager who initiated the sexual encounters, persisting even in the face of Smith's ongoing reluctance. Despite that, the School District and its Board persist in arguing here that Rager's seduction of his student assistant was "not unwelcome." Of course it was, and in my view, no reasonable jury could find otherwise on this record. See Carr v. Allison Gas Turbine Div., General Motors Corp., 32 F.3d 1007, 1011 (7th Cir.1994).
 
 
 [2]
 Although my concurring colleague and I certainly view the summary judgment record in this case differently (cf. Concurring Op. at 1035-36), I do not read Judge Coffey's opinion, or Judge Manion's for that matter, as suggesting that a reasonable jury would be unable to find from the record here that Southport officials were negligent or that they "should have known" of Rager's misconduct. (See id. at 1035; Maj. Op. at 1034.) Indeed, if that were the majority's position, it would have had no need to explain at such length why it believes that actual knowledge is required
 
 
 [3]
 Two additional circuits have more generally observed that Title VII provides "the most appropriate analogue when defining Title IX's substantive standards." Mabry v. State Bd. of Community Colleges and Occupational Educ., 813 F.2d 311, 316 n. 6 (10th Cir.), cert. denied, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987); see also Preston v. Commonwealth of Virginia ex rel. New River Community College, 31 F.3d 203, 206-07 (4th Cir.1994); Roberts v. Colorado State Bd. of Agriculture, 998 F.2d 824, 832 (10th Cir.), cert. denied, 510 U.S. 1004, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993). Moreover, the Ninth Circuit, in rejecting a claim of qualified immunity advanced by school district officials, also suggested that Title VII principles should apply to a sexual harassment claim advanced under Title IX. Oona, R.S. v. McCaffrey, 122 F.3d 1207, 1210-11 (9th Cir.1997), as amended, (Aug.25, 1997)
 
 
 [4]
 See Murray, 57 F.3d at 249 ("The Court's citation of Meritor ..., a Title VII case, in support of Franklin's central holding indicates that, in a Title IX suit for gender discrimination based on sexual harassment of a student, an educational institution may be held liable under standards similar to those applied in cases under Title VII."); Doe, 103 F.3d at 514 ("By citing Meritor ..., a Title VII hostile environment case, the Court indicated that it views with approval the application of Title VII principles to resolve similar Title IX cases."); see also Kinman, 94 F.3d at 469
 
 
 [5]
 The differences are apparent once the two statutes are considered side by side. Title VII provides that:
 It shall be an unlawful employment practice for an employer--
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....
 42 U.S.C. § 2000e-2(a). Title IX, by contrast, provides that:
 No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....
 20 U.S.C. § 1681(a).
 
 
 [6]
 As the district court in this case astutely observed:
 The absence of the word "agent" from Title IX is not dispositive. Sex discrimination is prohibited in all programs, activities and operations of covered educational entities. These programs, activities and operations will be supervised by agents. If only the "authorized" behavior of such agents is actionable, then the prohibition loses a great deal of its force. Concern about the scope of liability and its impact on school systems is quite legitimate, but such concern must yield to the sweep of Title IX's language and the Supreme Court's holding in Franklin that all appropriate relief is available.
 (R. 116 at 14.) See also Kadiki v. Virginia Commonwealth Univ., 892 F.Supp. 746, 754 (E.D.Va.1995) (Because Title IX encompasses "any operation" of an educational institution, "it is essentially inconsequential that Title IX does not expressly adopt agency principles."); Hastings v. Hancock, 842 F.Supp. 1315, 1318 (D.Kan.1993) (rejecting similar argument based on absence of the word "agent" in Title IX).
 The majority's analysis of the language of Title IX also takes no account of the fact that a private cause of action like the one we consider here is not provided for in Title IX itself, but was implied by the Supreme Court in Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Thus, the adjudicatory standards to be applied to such a private action are not easily discerned from the statutory text. Indeed, in considering whether compensatory damages are available to a private litigant in such an action, the Supreme Court cautioned that because the cause of action itself was implied in Cannon, "the usual recourse to statutory text and legislative history in the period prior to that decision necessarily will not enlighten our analysis." Franklin, 503 U.S. at 71, 112 S.Ct. at 1035; see also Carrie N. Baker, Comment, Proposed Title IX Guidelines on Sex-Based Harassment of Students, 43 Emory L.J. 271, 303 (1994) ("Because the right of an individual to bring suit under Title IX is an implied right of action, the language of the statute as well as the legislative history do not provide any adjudicatory standards.").
 
 
 [7]
 I am not persuaded that this expression of congressional intent may be ignored simply because it predates the Supreme Court's Meritor decision. (See ante, Maj. Op. at 1027 n. 14; see also ante, Concurring Op. at 1040-41.) If Congress intended Title VII and Title IX to provide similar protection against sex discrimination in the settings to which each statute is addressed, then I do not understand how the Meritor decision would alter that intent. Indeed, the Supreme Court was true to Congress' intent in Franklin when it recognized that hostile environment sexual harassment is actionable as sex discrimination under Title IX as well as under Title VII. See 503 U.S. at 75, 112 S.Ct. at 1037-38
 The concurring opinion, in addressing my reliance on this portion of the legislative history, notes as well that "Title IX has been on the books for more than twenty years (since 1972), [and] our Nation's legislature has not seen fit in that period of time to amend the law by inserting language that would even suggest that agency principles govern." (Ante, Concurring Op. at 1040-41.) As I have explained, that sort of argument ignores the structure of Title IX. Yet even taking Judge Coffey's premise to be valid, I submit that there would have been no reason for Congress to so alter the statute, because prior to February 17, 1997, when the Fifth Circuit decided Rosa H., no circuit court in the country had held that Title VII principles are inapplicable to a sex discrimination suit under Title IX. Instead, beginning with the First Circuit in Lipsett (with then-Circuit Judge Breyer on the panel), the circuits had consistently concluded, in accordance with congressional intent and the broad remedial purpose of the statute, that Title VII principles do in fact apply. See 864 F.2d at 901; see also Murray, 57 F.3d at 248-49; Doe, 103 F.3d at 514-15; Kinman, 94 F.3d at 469.
 
 
 [8]
 Despite citing the OCR's position in Rosa H., the Fifth Circuit declined to apply what merely were "proposed guidelines" at the time of its decision:
 In general, "[w]hen interpreting title IX we accord the OCR's interpretations appreciable deference." Rowinsky, 80 F.3d at 1015 n. 20. See also Leija, 101 F.3d at 406 (Dennis, J., dissenting) (urging adoption of the OCR's proposed guidelines). But we cannot apply these guidelines retroactively. As we have explained, recipients of Title IX funds are bound by their agreement with the federal government. The government can add strings to the Title IX funds as it disburses them. But it cannot modify past agreements with recipients by unilaterally issuing guidelines through the Department of Education. As far as this case is concerned, the proposed guidelines do not apply. We make no comment on how these guidelines might affect cases in which a school district accepts Title IX funds after the guidelines' promulgation date.
 Rosa H., 106 F.3d at 658. The Fifth Circuit's error, of course, which is reflected as well in the concurring opinion here, is in suggesting that the positions taken in the proposed guidelines are somehow new. (Id.; see also ante, Concurring Op. at 1039-40.) As the Sixth Circuit pointed out in Doe, and as the OCR itself emphasized in its "final policy guidance," the positions of the OCR at issue here are not of recent vintage, but have long represented the enforcement positions of the agency charged with administering Title IX. See Doe, 103 F.3d at 514 (citing 1988 OCR publication and 1981 OCR policy memorandum); see also Sexual Harassment Guidance, 62 Fed.Reg. at 12036; Maj. Op. at 1033 (accepting that "final policy guidance" represents the OCR's "longstanding view"); Williams & Brake, 30 Creighton L.Rev. at 439 (through its policy statements, regulations, and enforcement actions, the OCR "has consistently imposed an obligation on recipients to remedy discriminatory environments, including sexually hostile environments of which they knew or should have known.").
 My concurring colleague further suggests that my reliance on the "final policy guidance" runs afoul of the traditional "presumption against retroactivity" that the Supreme Court recently reaffirmed in Lindh v. Murphy, --- U.S. ----, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). (Ante, Concurring Op. at 1039-40.) As a general matter, I have no quarrel with that presumption; in fact, I dissented from this court's en banc decision in Lindh, which had applied provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") retroactively. See 96 F.3d 856, 885 (7th Cir.1996) (Ripple, J., joined by Rovner, J., dissenting). But I fail to see how the presumption is relevant here. The OCR's "final policy guidance" does not amend Title IX in the same way that the AEDPA amended the federal habeas corpus statute that was at issue in Lindh. Rather, the OCR merely formalized in the "guidance" its longstanding interpretation of existing statutory language. There is no retroactivity issue in this case.